# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Valladares*, 2013 IL App (1st) 112010

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BERLY VALLADARES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-2010 |
| Filed | July 24, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder and aggravated battery with a firearm under an accountability theory were upheld over his contentions that his counsel was ineffective in failing to prepare him for trial, failing to move to suppress his statements to police, and agreeing to the admission of gang evidence, that the instruction on accountability was improper, and that the State failed to present evidence other than defendant's statements to prove *corpus delicti*. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-21812; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Samuel Adam and Lauren Kaeseberg, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Neville and Justice Mason concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Berly Valladares provided a gun to a fellow gang member, Narcisco Gatica, who was upset after being denied entrance to a neighborhood party. Gatica then fired the gun into a crowd at the party, killing Francisco "Frankie" Valencia and seriously injuring Daisy Camacho. After a jury trial, Valladares was convicted, under an accountability theory, of first degree murder and aggravated battery with a firearm. Valladares's position, from the time of his police interview through his trial testimony, was that he had never been told, nor did he have any idea, that Gatica would use the gun he provided to commit a crime. Valladares was sentenced to 55 years for first degree murder, which included 15 years for the enhancement, armed with a firearm, and a consecutive sentence of 15 years for aggravated battery with a firearm.

¶ 2    Valladares contends his conviction must be reversed, claiming he received ineffective assistance of counsel because trial counsel failed to meet with him, did not file a motion to suppress his statements to the police, and agreed to the admission of prejudicial gang evidence. Valladares also contends the jury instructions did not properly instruct the jury on the law of accountability. Lastly, Valladares contends his conviction cannot stand where the State failed to present any corroborating evidence, other than his own statements, to prove *corpus delicti*, in other words, that a crime occurred.

¶ 3    Based on a thorough review of the record, we are unpersuaded trial counsel's representation was ineffective where counsel chose to proceed without filing a motion to suppress Valladares's statements to the police or limit the admission of gang evidence, decisions, in light of the defense theory, properly considered by the trial court to be ones of trial strategy. We also find the trial court's question concerning accountability during *voir dire* legally permissible and hold the trial court properly refused to instruct the jury with the defense-requested instruction, where an Illinois Pattern Jury Instruction on accountability informed the jury of the law. Lastly, the evidence, when viewed in a standpoint most favorable to the State, supports Valladares's convictions where the prosecution offered sufficient evidence of *corpus delicti* of first degree murder and aggravated battery with a firearm. Accordingly, we uphold Valladares's convictions.

¶ 4                                                    BACKGROUND

¶ 5        Jacqueline Iberra testified at trial that on Halloween, October 31, 2009, she rented a house at 1752 N. Rockwell, Chicago, to throw a birthday party for her then-boyfriend Marco Rios. A gate blocking the gangway limited access to the house. The party began at 10:30 p.m. and most of the invited guests came from Elgin, dressed in costume. Around 12:30 a.m., Iberra learned that three uninvited men, including Gatica, were trying to enter the party through the gangway. She had never seen the men before. Iberra and Rios asked them to leave and when the men lingered for a few minutes, escorted them out. No physical altercation occurred.

¶ 6        A short time later, Iberra heard what she thought were firecrackers. She ran to the door and saw guest Alejandro Sanchez carrying Daisy Camacho inside. Camacho was bleeding from her neck. Iberra went outside, where she saw Frankie Valencia, who had come to the party with Camacho, sitting next to a wall and bleeding. Neither Camacho nor Valencia was involved in asking the three uninvited men to leave.

¶ 7        Marco Rios testified that he and Iberra controlled access to the party by opening and closing the gate. After escorting the three uninvited men from the party, he heard five gunshots. Rios ran outside and saw Camacho bleeding from her neck and Valencia holding his chest.

¶ 8        Alejandro Sanchez testified he arrived at the party around 1 a.m. expecting to see Manuel Molina and Camacho. He called Molina to come open the gate for him and walked through the gangway with Molina, Camacho, and Valencia before hearing four to six gunshots coming from the gate. After he saw that Camacho had been shot, he carried her inside. Sanchez was unable to identify the shooter.

¶ 9        Camacho testified concerning the events leading up to the moment she realized she and Valencia had been shot. Camacho and Valencia attended DePaul University together. The party was thrown by Camacho's high school friends. She testified she did not see the shooter.

¶ 10       Valencia was shot three times–twice in the chest and once in the arm. Dr. Arangelovich testified Valencia died from multiple gunshot wounds and that the manner of death was homicide.

¶ 11       Chicago police forensic investigator Joseph Dunigan arrived at the scene around 3:15 a.m. Five fired shell cases were recovered from the front yard of the property. A little over a block away, at 1844 N. Rockwell, Dunigan recovered a semiautomatic firearm from under the porch. No latent impressions or fingerprints suitable for comparison were recovered from the firearm. The parties stipulated that the recovered firearm matched the fired bullets, five fired shell cases, and a fired bullet jacket fragment found at the scene as well as bullets found in Valencia's body.

¶ 12       The parties stipulated that a video recording system was operating in the area of 1752 N. Rockwell. One camera captured images of the sidewalk and surrounding area, one camera captured images of the gangway between 1752 and 1754 N. Rockwell, and one camera captured images from the alley behind 1752 and 1754 N. Rockwell. The individuals on the video were not identifiable.

¶ 13       The parties also stipulated to the records of Valladares's Sprint Nextel cellular telephone

and Gatica's T-Mobile cellular telephone. FBI special agent Joseph Raschke performed an analysis of the two phones for the period from 12:44 a.m. to 1:48 a.m. on November 1, 2009, and plotted out the geographic locations of the phones. In his opinion, the two phones were consistently co-located in close proximity to each other and the crime scene. There were a total of eight calls between the two phones from 12:45 to 1:46 a.m., four from Valladares's phone and four from Narcisco Gatica's phone, each lasting under a minute.

¶ 14    Chicago police detective Michael Landando was assigned to the case on November 2, 2009. He reviewed reports and videotapes showing the front and rear of the rented house.

¶ 15    The detectives concentrated their investigation on the members of the Maniac Latin Disciples (MLD) gang because there were two factions of the gang in that area of Rockwell. Detective Landando testified he interviewed several MLD members. The detectives spoke with individuals who stated they had seen Valladares walking with Gatica around the time of the shooting. Eliezer "Peanut" Contreras, who did not testify at trial, told detectives he saw Gatica holding a gun and fire it at the rented house. He said he did not see Valladares hand a gun to Gatica. Jovanny "Magic" Carrera, who also did not testify at trial, told detectives he was a few houses down from the rented house at the time of the shooting and that he saw Valladares and Gatica walking southbound on Rockwell and then heard gunshots a few minutes later. He did not see the shooting, but heard from others that Gatica had been the shooter.

¶ 16    On the morning of November 3, Detectives Landando and John Valkner went to Melrose Park to interview Valladares at his place of work. Detective Landando told Valladares he was investigating a homicide that took place on Halloween night on Rockwell and that because several people had seen Valladares during the shooting, Detective Landando wanted to interview him. Valladares agreed to accompany the detectives and talk with them. Detective Landando drove Valladares to Area 5 police headquarters.

¶ 17    Detective Landando testified that during the ride, and before any conversations, he advised Valladares of his *Miranda* rights because the police were unsure of the extent of Valladares's knowledge or involvement in the shooting. Valladares acknowledged he understood his rights and indicated he would talk with the detectives. Valladares stated he was a member of the MLD gang and that on the night of the shooting, he had been at North and Washtenaw drinking. Around midnight, as he was walking northbound, he saw four fellow gang members, whom he identified as Joe, Peanut, Silencer and Mickey. Valladares stated Mickey told him he had been pushed and asked Valladares to get a gun. Valladares thought Mickey might have been pushed by a rival gang member, a Cobra or Spanish Lord. Valladares told the detectives they would probably find his fingerprints on the gun because he gave it to Mickey. Detective Landando testified that at this point in Valladares's statement, he became a suspect and was placed under arrest. Valladares was not questioned any further until they arrived at Area 5.

¶ 18    Detective Landando testified Valladares "readily agreed" to go to Area 5 with the detectives and that he was cooperative, answering all the questions in the car without hesitation. Detective Landando stated he had no reason to believe Valladares would have stopped talking about the incident on his own and that he stopped questioning Valladares in

the car because he wanted to preserve what Valladares said.

¶ 19    At Area 5, the detectives activated the audio and video recording equipment and placed Valladares in an interview room. Valladares's subsequent conversation with the detectives was recorded and the video was published to the jury. Detective Landando testified Valladares never indicated he did not want to continue speaking with the detectives about the incident.

¶ 20    In his videotaped statement, taken at 9:10 a.m. on November 3, after indicating he understood his *Miranda* rights, Valladares reiterated that he was walking north when he encountered Mickey and other fellow gang members. Mickey said, "this motherfucker pushed me," and "this guy put hands on me." Valladares explained he thought Mickey meant the Cobras or Spanish Lords. Mickey told Valladares to "go get the stuff," which Valladares stated meant the gun. While Valladares loaded the gun with seven or eight bullets, a car approached with several people in it, who Valladares felt were "gonna come shoot." Valladares handed the gun over to Mickey "no questions asked" because if he did not, "it all comes to me." He explained that if a fellow gang member was hurt, he would be blamed.

¶ 21    After Valladares gave Mickey the gun, a group gathered. Valladares stated he walked with the group without knowing where they were going. Valladares believed Mickey wanted to "maybe do a hit or scare some–I mean I don't know." Later, Valladares stated, "never, I never knew it was, it was gonna happen." Valladares admitted he knew there was going to be some kind of altercation, but did not know it would be at the rented house on Rockwell. When asked if he knew the shooter would shoot the gun, Valladares responded, "[w]ell, definitely if it lead to that point, you know where–let's say a rival gang member–comes in those are the actions that use probable cause–you want to know whether they shooting or you're getting shot." Valladares stated no one told him what house they were going to or who the intended victim or victims would be; only that a gun was needed. Valladares claimed he did not know where the shooter was going to shoot until after the shots were fired. Valladares stated he did not see Mickey pass the gun to Gatica.

¶ 22    When Valladares heard gunshots, he wondered whether he was getting shot at or his fellow gang members were doing the shooting. Valladares stated he could not "exactly" tell the detectives who the shooter was, calling him "ChiChi." Later, Valladares admitted seeing Gatica fire the gun. At the time, Mickey was in front of Valladares and Gatica to the side. Valladares heard shots and everyone scattered. Valladares ran southbound. He did not ask for the gun back. Valladares returned Gatica's call on his cell phone and Gatica said he had looked for the gun, but could not find it. Valladares looked for the gun and admitted that if he had found it, he would have thrown it away or sold it.

¶ 23    Valladares's mother told him someone had been killed during the shooting. He told his mother, "I didn't know he was gonna do it. What am I supposed to do, tell him no and then things happen and then what, you gonna end up seeing me with a sword in my eye, maybe a fractured rib." Valladares then provided the detectives Gatica's cell phone number.

¶ 24    Later, the detectives confronted Valladares with the fact that Gatica confessed and had no reason to lie about who gave him the gun. Valladares then admitted that he gave the gun to Gatica and that Mickey never touched it.

¶ 25    The detectives pointed out, and Valladares acknowledged, that on the video, the group slowed down in front of the rented house. Valladares denied there was any conversation among the group about what they were doing. Detective Landando testified that Valladares identified a photograph of Gatica as the shooter. Valladares lived about a block north of the shooting.

¶ 26    Valladares testified at trial. He claimed that as a member of the MLD gang, he received orders from higher ranking members and that he had no role in decision making. Valladares testified there were 5 to 10 higher ranking members than him, as well as the gang governor. Valladares admitted he ran the Talman Wabansia section of the MLD, but added that the governor also ran the section. Valladares testified he gave orders to lower ranking gang members, but that if he disobeyed the governor's rules, he would be "disciplined." In October 2009, Valladares was the gun holder for the gang. His role meant that if any member of the gang requested a gun, he was to provide it. Valladares testified that he could not refuse to give a gang member a gun or he would be disciplined. If Valladares refused to supply a gun, he was responsible for anything bad that happened to the gang member requesting the gun. Valladares was responsible for deciding how much ammunition to load in the gun, which depends on why the person was requesting it. Valladares testified he thought Gatica requested the gun because of a rival gang dispute, either with the Spanish Lords or the Cobras. He said that he knew the reason the gun was requested was for retaliation, although no one said anything about gang retaliation.

¶ 27    Valladares testified that his statement to the police explained what happened on the night of the shooting and that he was cooperative with the police at all times. Initially he told the police he gave the gun to Mickey, but that was untrue. He lied, he admitted, because he was "scared" and "didn't want to get involved." Valladares testified that he did not know for certain there would be a shooting, only that it was a possibility if something else happened. Valladares testified that during the shooting, he was one to two feet from Gatica and that Gatica gave no prior indication of what he intended to do.

¶ 28    Valladares testified that even though he was walking with his fellow gang members toward the rented house, he was not going with them, but rather, to an area where two girls were waiting for him. Valladares acknowledged he never mentioned that to the detectives. Valladares said he wore a hooded sweatshirt with the hood over his head to cover his identity while he walked south of Rockwell toward the house. He first admitted, then denied, that it was because he was afraid the girls he was going to see would recognize him.

¶ 29    After denying being in the surveillance video of the shooting, Valladares identified himself as being the person behind Gatica in the video. Valladares acknowledged that the individual in front of Gatica slowed down even before Gatica made a move toward the gate by the house. Valladares testified he saw Gatica shoot the gun, and that after the shooting, he ran home.

¶ 30    Valladares testified that when the police came to his workplace a few days after the shooting, he knew they had found out where he was the night of the shooting. Valladares testified he knew his fingerprints were on the gun because he gave it to Gatica. Valladares did not think the police would find the shooter and that is why he lied about giving the gun

to Mickey.

¶ 31                        Motion for New Trial With Substituted Counsel

¶ 32     Following his convictions for first degree murder and aggravated battery with a firearm, Valladares moved for a new trial with substituted counsel. At the posttrial hearing on his motion, Valladares's mother testified that she did not hire Jack Wilk as trial counsel. She acknowledged that she met Wilk at David Weiner's office and that Wilk appeared in court on Valladares's behalf before trial. She further acknowledged that she did not complain about Wilk's representation until after Valladares's conviction.

¶ 33     Weiner testified he informed Valladares's mother that either he or Wilk, who served as cocounsel, would visit Valladares. Weiner was retained on January 20, 2010. Weiner admitted that he did not visit Valladares in jail, but Wilk did on January 21 and again on September 20, three days before trial. Weiner acknowledged he never showed Valladares the videotaped recording of his statement to the police, but testified he did show Valladares the transcript of the recording at a court date. Weiner saw Valladares every court date in the lockup. During those times, he showed Valladares the police reports and the statement transcript and discussed the case with him. Weiner also spoke with Valladares over the phone several times, accepting his collect calls from jail. Weiner acknowledged that the jail records calls from inmates, but testified that did not keep Valladares from discussing the case, including "exculpatory statements."

¶ 34     Weiner testified that each time he spoke with Valladares about the case, Valladares's discussion of the facts was consistent with his recorded statement to the police. Weiner believed Valladares's statement should be admitted at trial to corroborate the defense theory. According to Weiner, Valladares convinced him that he merely passed the gun to Gatica and had no idea that Gatica had been at a party and was going to use the gun to commit a crime. Weiner believed that based on the law of accountability and the requirement that there be a finding of specific intent, Valladares's statement would be helpful in convincing the jury that Valladares was not accountable because he did nothing other than pass off the gun.

¶ 35     Weiner testified that "all along" Valladares wanted to testify and that Valladares made the decision to do so. Because Valladares was going to testify, Weiner was of the opinion that even if his statement was suppressed, it could be used in rebuttal. Moreover, the statement's admission would benefit Valladares by being a prior consistent statement.

¶ 36     Due to the availability of witnesses who could testify they saw Valladares hand the gun to Gatica and walk with him to the scene of the crime, if Valladares's statement had been suppressed, and the witnesses and Valladares testified, Weiner believed Valladares's statement would have come in as impeachment evidence in addition to the witness testimony. For Weiner, Valladares's testimony and earlier statements to the police gave the jury an explanation for Valladares's actions, which was necessary to defeat the State's case.

¶ 37     Weiner read the arrest reports and viewed the recording of Valladares's statement before trial. He knew that an arrest without a warrant or probable cause may be illegal and that a subsequent statement may be suppressed. But, he did not file a motion to quash the arrest because Valladares voluntarily spoke with the detectives in their car and Valladares's

statements were not part of a custodial situation. And even though Wilk's notes stated that in the interrogation room at the police station Valladares "was promised he could go home if he gave it up," Weiner understood Valladares's statement to be voluntary under the circumstances.

¶ 38    Weiner testified he did not object to the State's motion *in limine* to allow gang affiliation evidence, with the caveat that the State not call a gang expert to amplify the evidence. But, Weiner was aware of the potential for prejudice with the gang evidence and, for that reason, asked the court to inquire during *voir dire* whether the jurors could be fair despite gang evidence. Weiner felt the gang evidence allowed the defense to explain Valladares's statement and conduct in context.

¶ 39    Valladares testified that he met with Weiner during all of his court dates and that the first time he felt he received ineffective assistance of counsel was after he was convicted. Valladares denied Weiner showed him the police report or that he called him collect from the jail. Valladares claimed the longest he ever spoke with Weiner was for 10 minutes and that he wanted Weiner to come see him in jail. Valladares stated that on September 20 he met with Wilk for 10 to 15 minutes and Wilk said he did not know whether it was a good idea for Valladares to testify. According to Valladares, at that time, Wilk not only did nothing to prepare Valladares to testify, but never informed him that it was Valladares's decision whether or not to testify in the first place. Valladares claimed he did not want to testify at trial, although he acknowledged that before testifying, the court admonished him that it was his decision whether to testify and that he told the court he was choosing to testify. He further admitted he did not tell the court he needed additional time to discuss the decision with his counsel.

¶ 40    Valladares conceded that a few days before trial, he knew he was going to testify that even though he gave the gun to fellow gang member Gatica, he had no idea what Gatica intended to do with it. Although Valladares at first claimed he did not know if this testimony matched his recorded statement–he and his counsel prepared just 10 to 15 minutes in lockup before he testified–Valladares owned up that it was consistent with his defense. And, Valladares admitted that even with additional time to prepare and a new attorney, he would not change his testimony.

¶ 41    Jack Wilk testified he met confidentially with Valladares on September 20 in the jail for an hour to an hour and a half. According to Wilk, before that date, Valladares indicated that he wished to testify at trial and never indicated otherwise. Wilk discussed trial strategy with Valladares during their meeting and informed Valladares that he had the right to decide whether or not to testify. Wilk went over with Valladares the transcript of Valladares's recorded statement to the police and prepared Valladares to testify. Wilk explained that he wanted Valladares to know what was in his statement and that the State's case was based on accountability. Wilk testified it was part of the defense strategy to allow the recorded statement into evidence. Wilk thought the key word in Valladares's statement, "[w]ell, arrange it, maybe do a hit," was "maybe," and he explained that to Valladares. Wilk asked Valladares what he meant and Valladares explained that he was not sure what was going to happen and that there were a lot of possibilities. Wilk also met with Valladares at the jail on January 21, saw Valladares several times during lockup, showed him the police reports, and

discussed the evidence with him. Wilk said Valladares knew there was a video of the crime and his statement to the police, but never asked to see either of them.

¶ 42    Following the hearing, the court denied Valladares's posttrial motion for a new trial. The court rejected Valladares's contention that it erred by "indoctrinating the jury with regard to the law of accountability" by questioning the jury, at the State's request, during *voir dire*. The court held that it acted properly within its discretion by asking a "brief question." The court also found it significant that "the jury was properly instructed as to the law of accountability at the conclusion of the evidence."

¶ 43    The court further rejected Valladares's claims of ineffective assistance of trial counsel based on counsel's alleged deficiencies in failing to file a motion to quash arrest, to suppress Valladares's statements, and to preclude gang evidence, and for counsel's failure to visit Valladares in jail. The court found Valladares was represented by two experienced attorneys and that although Weiner never visited Valladares in jail, he did speak with him several times during lockup and Wilk met with Valladares and prepared him to testify at trial.

¶ 44    Concerning the failure to file a motion to quash arrest or suppress Valladares's statements, the court noted that Weiner did not believe Valladares's statement was involuntary, and he detailed a reasonable trial strategy for his decision. Moreover, as part of the defense strategy, Weiner believed Valladares should testify to explain that he did not know what Gatica would do with the gun, which he gave him based on his role in the gang, and further, Valladares wished to testify. The court found defense counsel's decisions were the result of sound trial strategy and not incompetence or unreasonable trial strategy.

¶ 45    The court further held Valladares failed to show prejudice because "there would have been no basis to file a motion to quash arrest and suppress evidence." The court found the police reports, detailing Valladares's arrest and the circumstances surrounding the giving of his statements, show Valladares cooperated with the police. Valladares testified as much.

¶ 46    Regarding the gang evidence, the trial court determined the evidence to be both relevant and admissible to show Valladares's motive for giving the gun to Gatica.

¶ 47    Lastly, the trial court rejected the contention that his counsel was ineffective for failing to request instructions on the defenses of compulsion, necessity, and mistake of fact. The court concluded that those defenses were not supported by the evidence.

¶ 48    Valladares timely appeals.

¶ 49                                    ANALYSIS
¶ 50                    Ineffective Assistance of Counsel
¶ 51    Valladares argues his trial counsel provided ineffective assistance in that counsel failed to visit him in jail, failed to file a motion to suppress his statement, and failed to limit the admission of gang evidence. Valladares submits that each individual reason suffices to require reversal of his convictions, but argues the totality of the cumulative errors is so egregious that a new trial is warranted. Valladares further argues the trial court erred in its rulings, allowing counsel's ineffectiveness to "permeate the trial."

¶ 52    To prove ineffective assistance of counsel, the defendant must allege facts showing

counsel's representation was both objectively unreasonable and counsel's deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant bears the burden of demonstrating he received ineffective assistance of counsel. *People v. Burks*, 343 Ill. App. 3d 765, 774 (2003). To do so, the defendant must overcome a "strong presumption" that counsel's performance fell within a wide range of reasonable professional assistance. *People v. Pecoraro*, 175 Ill. 2d 294, 319-20 (1997). In determining the adequacy of the defendant's legal representation, we consider the totality of the circumstances. See *People v. Long*, 208 Ill. App. 3d 627, 640 (1990). We recognize that the right to effective assistance of counsel refers to "competent, not perfect representation" (*People v. Stewart*, 104 Ill. 2d 463, 492 (1984)), and "[m]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent" (internal quotation marks omitted) (*People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988)).

¶ 53                              Attorney/Client Interaction

¶ 54    Valladares's first claim of ineffective assistance is based on his contention that trial counsel, David Weiner, performed deficiently by proceeding to trial without meeting with and preparing Valladares to testify, and that this caused prejudice to his case.

¶ 55    From the time of Valladares's arrest on November 3, 2009, and throughout the trial proceedings, Valladares remained incarcerated. Weiner was hired by Valladares's family as lead counsel on January 20, 2010. Valladares contends Weiner never visited him in jail nor did they have a single confidential conversation. Valladares argues the only communications he had with Weiner occurred during the trial while Valladares was in the lockup behind the courtroom.

¶ 56    Jack Wilk, an attorney at Weiner's firm and cocounsel, visited Valladares twice during the nine-month period from his arrest to the start of trial. During Wilk's first visit on January 21, 2009, he took notes on Valladares's arrest. No discovery was available at that time.

¶ 57    Discovery, including Valladares's videotaped statement to the police, the video surveillance of the crime, and police reports was later provided to the defense. Valladares claims counsel never visited him to discuss discovery despite repeated requests.

¶ 58    Three days before the jury trial was set to begin, Wilk went to the jail to visit Valladares. Valladares contends that during this visit, no decision was made concerning whether he would testify at trial. And, Wilk did not give Valladares any sample questions or answers or otherwise adequately prepare him for any testimony he would give at trial. Wilk did bring a transcribed version of the videotaped statement Valladares gave to the police, but did not show Valladares either of the two videos. Valladares saw his videotaped statement to the police and the surveillance video for the first time alongside the jury during trial.

¶ 59    A valid claim of ineffective assistance of counsel may exist where counsel failed to communicate with defendant. *People v. Hobson*, 386 Ill. App. 3d 221, 239 (2008) (citing *People v. Smith*, 268 Ill. App. 3d 574, 578-79 (1994)). The sixth amendment requires defense counsel to keep defendant informed of developments in the case and consult with him or her on all major decisions. *Smith*, 268 Ill. App. 3d at 579 ("A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable

requests for information." (Internal quotation marks omitted.) (citing *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991))). In *Smith*, this court found counsel's concealment of the police reports was "not a tactical decision within the attorney's discretion," particularly because counsel was aware that his client wanted to view the police reports. *Smith*, 268 Ill. App. 3d at 579. Valladares argues that similar to the facts of *Smith*, his mother pleaded with Weiner to visit her son and although he "promised" he would do so, Weiner never did.

¶ 60    Valladares argues that consultation with Weiner would have helped the defense, especially in regard to Valladares's direct and cross-examination at trial. When defense counsel tried to elicit from Valladares that he would be punished and beaten if he did not provide a gun when requested by a gang member, Valladares merely stated that he would be "disciplined," which he explained meant a "violation." Defense counsel asked Valladares to explain what a violation meant, to which Valladares responded, "Violation means someone who refuses to follow orders." Defense counsel asked, "What happens when you get a violation?" Valladares responded, "I get violated from body head to toe or body only." Defense counsel asked, "What does that mean?" Valladares's response was still unclear, "Violation means more like discipline from the gang by not following orders." Valladares argues his responses to counsel's questions on both direct and cross-examination establish that he was not prepared to testify.

¶ 61    During the posttrial hearing, Weiner, while acknowledging that he never traveled to the jail to meet with Valladares personally, refuted Valladares's claim that he never spoke with Valladares before trial. Weiner testified he spoke with Valladares several times throughout the proceedings by telephone and in the courtroom lock-up. Weiner said he knew "all along" that Valladares wanted to testify and that he discussed this with Valladares throughout his representation. Cocounsel, Wilk, corroborated this point, testifying that Valladares indicated before September 20 that he wished to testify on his own behalf.

¶ 62    Wilk met with Valladares twice at the jail. Wilk testified that during their second visit, three days before trial, he prepared Valladares to testify by going over the transcripts of Valladares's videotaped statement and providing Valladares with some questions with which he would start his testimony, informing Valladares how his testimony would proceed, and leading him through the events of the shooting as they had occurred.

¶ 63    Before testifying, Valladares acknowledged in open court that he had discussed his decision to testify with his attorneys and that he did not need additional time to confer with them. Valladares testified at trial consistently with his videotaped statement and his theory of defense. At the hearing on his posttrial motion, Valladares admitted that he would not change his trial testimony concerning his knowledge of Gatica's intent with the gun even if he had a new attorney and additional time to prepare his testimony.

¶ 64    The record shows there was sufficient communication between the defense team and Valladares. Moreover, Valladares has not explained how additional pretrial communication with Weiner would have altered the outcome of his case. See *People v. Penrod*, 316 Ill. App. 3d 713, 723 (2000) (despite trial counsel's admission that he never called or visited the defendant in jail, representation was deemed effective where the defendant did not show how

-11-

further communication with counsel would have altered the outcome of trial). Our review of the record leads us to the same conclusion of the trial court, *i.e.*, that Valladares's defense team adequately understood the factual and legal issues in the case. Cocounsel Wilk testified he and Valladares went over the transcript of Valladares's statement and all of the police reports before trial. And, Valladares's testimony during cross-examination at the posttrial hearing undermines his argument that he was unprepared to testify. Valladares admitted that even with a different attorney and more time to prepare, he would have left intact his testimony concerning Gatica's intent, a crucial element of the defense theory. Despite Valladares's claims that consultation and meetings with Weiner would have provided Weiner with valuable insight into the case, Valladares neglects to indicate what that insight would have been or how additional communication would have altered the outcome of the case. Hence, Valladares is unable to show prejudice or that he was denied a fair trial or that, absent the alleged ineffective assistance, the result of the proceeding would have been different.

¶ 65     Further, we find wholly irrelevant and immaterial to our decision in this case Valladares's contention in his reply brief that we should consider Weiner's representation in *People v. Garcia*, 2012 IL App (1st) 102090-U. Accordingly, we decline to address the argument further.

¶ 66                                         Motion to Suppress

¶ 67     Valladares next claims he received ineffective assistance of counsel because trial counsel failed to file a motion to suppress his statements to the police. Valladares contends there was no objective reason not to file a motion to suppress and the admission of his statements was highly prejudicial.

¶ 68     Valladares argues the evidence connecting him to the crime came only from his own admissions in the videotaped statement he made to the police and via Detective Landando's testimony concerning the statements Valladares gave in the car on the way to Area 5. No witness at trial identified Valladares as being present at the time of the shooting, as handing the gun to Gatica, or as present on the surveillance video recording of the shooting. There was no physical evidence connecting Valladares to either the gun or the crime scene.

¶ 69     It is undisputed that defense counsel never filed a motion to suppress the unrecorded statement Valladares made in Detective Landando's car or his videotaped statement at Area 5. Valladares contends a motion to suppress each of his statements would have had merit and if presented, would have been granted. Valladares further argues that even if defense counsel's decision not to present a motion to suppress can be considered one of trial strategy, the strategy cannot be considered reasonable under the circumstances here because counsel had not yet met with Valladares to determine if he would testify at trial at the time the motion to suppress should have been filed.

¶ 70     To prove counsel's representation was deficient, the defendant must overcome a "strong presumption" that counsel's conduct was the result of sound trial strategy, not incompetence. *Pecoraro*, 175 Ill. 2d at 319-20. Counsel's failure to file a motion to suppress does not demonstrate incompetent representation when it turns out the motion would have been futile. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). If it is easier, a court may proceed directly to

-12-

the second prong of *Strickland* and dismiss an ineffective assistance claim on the ground that it lacks sufficient prejudice, without first determining whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697. To establish prejudice resulting from counsel's failure to file a motion to suppress, a defendant must show a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had the evidence been suppressed. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005) (citing *People v. Orange*, 168 Ill. 2d 138, 153 (1995)).

¶ 71 At the conclusion of the posttrial hearing, the trial court held trial counsel had rendered effective assistance of counsel in choosing to allow Valladares's recorded statement to be admitted at trial.

¶ 72 In his statements to the police, Valladares consistently maintained that he did not know Gatica was going to shoot the gun or who the victims would be. Valladares explained that given the gang hierarchy, he had no discretion whether to provide Gatica with the gun once he requested it.

¶ 73 Defense counsel testified that as a matter of strategy, the defense team chose to allow the admission of Valladares's statements to the police because they served to bolster the defense theory. Defense counsel wanted to use the videotaped statement as a prior consistent statement supporting Valladares's testimony that he did not know what Gatica planned to do with the gun and that he provided the gun only because he was required to based on his position within the gang. Counsel testified the State could prove the substance of Valladares's statement even without the statement because witnesses could testify they saw Valladares with Gatica before the shooting and that Valladares handed the gun to Gatica and went with him to the house. Defense counsel believed that unlike the witnesses the State could call, Valladares's statement to the police explained the reasons behind Valladares's actions, *i.e.*, that he would be beaten if he did not comply with Gatica's request. Defense counsel believed Valladares's statements bolstered the defense theory that Valladares did not intend to aid or abet Gatica in the commission of the crime as required by the accountability statute. Counsel also felt the statements helped the jury to see Valladares as someone willing to cooperate with the police. By not challenging the admissibility of Valladares's statements, defense counsel's strategy was to gain an advantage based on the close consistency between Valladares's trial testimony and his prior statements.

¶ 74 During the posttrial hearing, defense counsel noted that although the State did not call witnesses to testify they saw Valladares hand the gun to Gatica and accompany him to the house, the State had witnesses available that could have so testified. The availability of these witnesses had Valladares's statements been suppressed was an important factor in defense counsel's strategy in not objecting to the statements' admission. Had the witnesses testified, the jury would hear evidence about Valladares's actions that night, but would not have heard Valladares's explanations for his actions. Defense counsel considered Valladares's explanation for his actions compelling evidence necessary to defeat the State's case.

¶ 75 Further, defense counsel believed Valladares could have been impeached with the statement, even if it had been suppressed, and allowing the whole statement to be admitted was better than allowing the State to use portions of the statement during impeachment.

¶ 76    Lastly, defense counsel testified to the likelihood that a motion to suppress would have been successful. Concerning Valladares's unrecorded statement given in the police car, counsel believed the statement could not have been suppressed as a result of an illegal arrest because Valladares admitted at trial that he was cooperative with the police. Detective Landando testified Valladares voluntarily accompanied the officers to Area 5 for questioning and that he was not placed under arrest until he made incriminating statements in the car. At the posttrial hearing, Valladares testified he was arrested before entering the officers' car, but that testimony was undermined by his trial testimony. The trial court found there was "no basis to file a motion to quash arrest."

¶ 77    Valladares's trial testimony supports a conclusion that his statements to the police were voluntary. Valladares admitted at trial that he spoke with the police because he believed his fingerprints were on the gun. Although Wilk's notes from his conversations with Valladares indicated Valladares claimed the police promised he could go home if he told them about the incident, Weiner testified he did not believe Valladares's statements would be considered involuntary under any circumstances. The trial court found no basis for a motion to suppress the evidence.

¶ 78    Valladares has failed to overcome the strong presumption that trial counsel's decision not to file a motion to suppress was the result of sound trial strategy and that had counsel filed the motion, it would have been successful. Accordingly, Valladares's ineffective assistance claim fails.

¶ 79                                    Gang Evidence

¶ 80    Next, Valladares argues that by failing to object to the admission of gang evidence, his defense counsel did not provide effective assistance of counsel. Valladares contends gang evidence permeated the entire trial despite the victims' ignorance of the gang status of the three uninvited guests and there was no gang motivation behind the shooting. Most prejudicial, Valladares argues, was the State's questioning during Valladares's cross-examination bringing out that Valladares would give a gun to a 13-year-old gang member if asked, and the irrelevant evidence of Valladares's gang tattoos and activities. Valladares urges that the gang evidence, if relevant, was more prejudicial than probative and, therefore, should have been excluded or, at least, severely limited. Valladares contends there is no sound trial strategy supporting counsel's decision to forego seeking at a minimum a limiting instruction regarding the prejudicial effect the gang evidence had on Valladares's case.

¶ 81    For Valladares, his counsel's decision not to object at trial to gang evidence cannot be considered a reasonable strategy in the absence of a request for appropriate instructions which would have supported such a strategy. According to Valladares, if his counsel strategically sought the admission of evidence of gang membership to explain why Valladares gave the gun to Gatica, the only reasonable strategy would be to then prove that based on gang hierarchy, Valladares had no choice but to give Gatica the gun. Yet, if this was counsel's strategy, Valladares argues, it was unreasonable for counsel to not seek an instruction for compulsion or necessity. Valladares argues that regardless of the reasonableness of trial counsel's strategy, this dereliction resulted in prejudice and led to the

admission of the only evidence connecting Valladares to the crime.

¶ 82 Courts have found a particular prejudice among juries in this district concerning gang evidence. See *People v. Hamilton*, 328 Ill. App. 3d 195, 202 (2002) ("We recognize there may be strong prejudice against street gangs in the Chicago area."). Based on the prejudicial nature of gang evidence, this court has held that evidence of gang membership outweighs prejudice and "becomes relevant when it establishes the reasons for deadly gang behavior." *Hamilton*, 328 Ill. App. 3d at 202 (citing *People v. Colon*, 162 Ill. 2d 23, 30 (1994)). Valladares argues that here, as in *Hamilton*, "the torrent of detail concerning gang life, especially the prevalence of gang tattoos *** was unnecessary piling on. The trial court should have done some editing." *Id.* Yet, unlike *Hamilton*, where this court found there was no abuse of discretion, Valladares contends an abuse of discretion is patently clear. Before trial, the court specifically stated its concern for the prejudice from the admission of gang evidence, asking defense counsel, "And is that a matter of trial strategy, not having an objection to that gang evidence?" Likewise, despite defense counsel's recognition early in the proceedings of the risk of excessive gang evidence, counsel failed to object or ask for a limiting instruction. Valladares argues that even if we accept that trial strategy supports the admission of the gang evidence, "only the bare minimum" should have come in.

¶ 83 By not objecting to the admission of gang evidence and the State's excessive argument, Valladares contends that defense counsel's representation was deficient and violated his constitutional right to effective assistance of counsel. Valladares argues trial counsel had a duty to object to the introduction of excessive gang evidence, *i.e.*, that evidence which went beyond what was minimally required to establish the facts necessary for the defense. Valladares further argues counsel erred by failing to object and move for a mistrial when the State "exploited" the gang evidence in argument. Valladares argues evidence of his membership and role within MLD sufficiently establish the necessary facts for both the State and defense. On the other hand, evidence of his gang tattoos and testimony that he would provide a gun to a 13-year-old if asked, prejudiced the jury against him. Valladares asserted that his trial counsel was ineffective for failing to mitigate the prejudice of this evidence, particularly because counsel had earlier acknowledged the risk of prejudice from gang evidence.

¶ 84 Valladares insists that even if the evidence was crucial to his defense, counsel was ineffective for failing to request a limiting instruction. This argument supposes that had defense counsel's strategy been reasonable, the gang evidence should have been limited by instruction only to the relevant issue, *i.e.*, compulsion or necessity, and counsel's failure to do so was not strategic, but ineffective. Valladares contends the jury should have been told it could not consider the evidence of gang membership as proof of his guilt.

¶ 85 The State responds that it would have been futile for defense counsel to object to the admission of gang evidence and that gang evidence actually proved useful to the defense by offering Valladares an explanation for his actions. Based on the gang evidence, defense counsel was able to credibly argue to the jury that Valladares gave the gun to Gatica because his role in the gang required him to supply a gun to a fellow gang member whenever requested. Valladares testified he believed Gatica wanted the gun for possible retaliation or protection from a rival gang member. The evidence bolstered the defense theory that

Valladares did not know Gatica intended to shoot individuals at the party with the gun Valladares provided.

¶ 86    In recognizing the potential prejudice of the gang evidence before the trial even began, defense counsel told the court that allowing the evidence was a matter of trial strategy. In response to the court's question concerning whether he had discussed the strategy with his client, Weiner indicated he had and, responding to the court's questioning, Valladares indicated that he was in agreement with counsel's strategy.

¶ 87    The gang evidence primarily came from Valladares's recorded statement and his own trial testimony. Detective Landando was the only other witness who testified concerning gang matters and his testimony corroborated Valladares's testimony that he supplied the gun to Gatica because of his role within the gang. The evidence concerned Valladares's gang membership, the territory of his gang, the naming of two rival gangs, Valladares's responsibilities within the gang, *i.e.*, as gun holder, and the extent of his authority over other gang members and theirs over him. The State did not call a gang expert to testify.

¶ 88    The State contends the gang evidence was relevant to its theory of the case. To convict Valladares on an accountability theory, the State's theory was that once Valladares agreed to go with Gatica to retaliate against what he believed to be rival gang members, after having provided the gun, he was responsible for any criminal acts that were done in furtherance of that plan.

¶ 89    The trial court found the evidence to be relevant and properly admitted. The court stated that a motion to preclude would have been denied had it been presented.

¶ 90    The gang evidence was beneficial not just to the State's case, but to the defense case as well. The case turned on what Valladares knew and intended at the time he handed the gun to Gatica. The defense theory was that Valladares could not be convicted on an accountability theory based on Gatica's actions simply because he provided him the gun. Defense counsel sought to introduce reasonable doubt into the State's case by attacking the element of knowledge through the use of gang evidence. To convict Valladares, the State was required to prove, beyond a reasonable doubt, that Valladares intended to promote or facilitate the commission of an offense and that he knowingly aided and abetted Gatica in the commission of the offense. 720 ILCS 5/5-2(c) (West 2010). Proof that Valladares was present during the crime, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact could consider in determining Valladares's legal accountability. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). Through the gang evidence, the defense sought to explain Valladares's actions and establish that Valladares was required to provide a gun to any gang member that requested one, without discretion, and with no regard for the reason behind the request. Through this explanation, defense counsel sought to defeat the State's claim that Valladares had the requisite intent to promote the crime or that he knowingly aided Gatica in the shooting.

¶ 91    Our review of the record shows that trial counsel presented a plausible, consistent defense and acted as an advocate on Valladares's behalf throughout the proceedings. Trial counsel investigated the case, presented Valladares's defense, and vigorously argued that

Valladares did not have the requisite knowledge to be accountable for Gatica's actions. Although trial counsel's strategy was ultimately unsuccessful, the record reflects that trial counsel exposed the State's case to meaningful adversarial testing.

¶ 92    Moreover, Valladares's contention that defense counsel should only have used the gang evidence for a defense of compulsion or necessity is unsupported by any legal authority, and, as the trial court found, constitute defenses inapplicable under the facts of the case.

¶ 93    The affirmative defense of necessity is defined as:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2010).

The defense is unavailable here because there was no evidence of an imminent threat of harm or danger to defendant. See *People v. Brown*, 341 Ill. App. 3d 774, 782 (2003).

¶ 94    The defense of compulsion is defined as:

"A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he *** performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he *** reasonably believes death or great bodily harm will be inflicted upon him *** if he does not perform such conduct." 720 ILCS 5/7-11(a) (West 2010).

Valladares's defense theory was that he provided the gun to Gatica out of compulsion that he would be severely beaten. A defense of compulsion, however, is not available unless the threat is of "imminent" death or harm. See *Brown*, 341 Ill. App. 3d at 782.

¶ 95    In denying Valladares's posttrial motion, the trial court properly found Valladares's claims of ineffective assistance of counsel lacked merit and that Valladares could not meet his burden under either prong of *Strickland*. We similarly reject Valladares's claims. Defense counsel's decision to use the gang evidence to try to explain Valladares's actions as nonaccountable was a reasonable and legitimate trial strategy, even though it turned out to be unsuccessful.

¶ 96                              Jury Instructions

¶ 97    Next, Valladares argues the trial court erred by pre-instructing the jury during *voir dire* concerning the law of accountability. The error was further exacerbated, Valladares contends, by the trial court's use of a non-Illinois Pattern Jury Instruction that omitted any reference to a *mens rea* element as required for a crime of accountability. Valladares denotes the court's instruction as a misstatement of the law, which severely prejudiced him throughout the trial.

¶ 98    " 'The purpose of the *voir dire* examination is to assure selection of an impartial jury; it is not be used as a means of indoctrinating a jury, or impaneling a jury with a particular predisposition.' " *People v. Mapp*, 283 Ill. App. 3d 979, 986 (1996) (quoting *People v. Bowel*, 111 Ill. 2d 58, 64 (1986)). The trial court has "broad discretion" in determining the

scope of questions allowed during *voir dire*. *Mapp*, 283 Ill. App. 3d at 988. The court does not abuse its discretion during *voir dire* where the questions to jurors create " 'a reasonable assurance that any prejudice or bias would be discovered.' " *Mapp,* 283 Ill. App. 3d at 986 (quoting *People v. Dow*, 240 Ill. App. 3d 392, 397 (1992)). This court has made clear that during *voir dire*, potential jurors may be given a brief summary of accountability principles and then inquire whether the jurors can follow the law and apply those principles. *People v. Klimawicze*, 352 Ill. App. 3d 13, 26 (2004) (citing *Mapp*, 283 Ill. App. 3d at 989).

¶ 99    Although some inquiry about accountability can be appropriate, we must look at the specific inquiry and determine whether the inquiry remained within the bounds of acceptability by being a search for fundamental bias or misconception about accountability principles among the prospective jurors. See *Mapp*, 283 Ill. App. 3d at 983-91.

¶ 100    The trial court asked the prospective jurors:

"Ladies and gentlemen, at the end of this case, the court may instruct you at the close of evidence that a person who plans, aids, or agrees to aid others in the commission of a crime is legally responsible for any crime committed in furtherance of that plan by any of those other persons. Would you follow the law if it is given to you in this case? Is there anybody here who could not follow that law?"

¶ 101    The State argues the wording of the question in the present case is not meaningfully distinct from the wording of the questions presented in *Klimawicze* and *People v. Davis*, 195 Ill. 2d 1 (1983), which were upheld as properly within the trial court's discretion.

¶ 102    In *Klimawicze*, the court asked, " 'Do you understand under the law of accountability, that someone may be found accountable or responsible for the actions of another?' " *Klimawicze*, 352 Ill. App. 3d at 26. In *Davis*, the prosecutor asked the prospective jurors:

" 'The law in certain instances would provide that a person would be held responsible for the acts of a co-defendant, a cohort in crime.

* * *

*** The Court will instruct you about this, this aspect of the law, that a person can be held accountable and responsible for the facts of another. Would it affect your ability in deciding this case on the issue or the charge of murder provided that the law states that the defendant could be held accountable under the facts that the defendant, this defendant before you, did not do the direct act, did not pull the trigger of the gun so to speak, that caused the death of the individual. Do you think that would affect your ability to decide or could you follow the law?' " *Davis*, 95 Ill. 2d at 18.

¶ 103    Without citing any case law for support, Valladares suggests the trial court's inquiry was improper because the question did not contain the *mens rea* element. The element was not present in the inquiries made in *Klimawicze* and *Davis* and yet, both inquiries were upheld as properly within the trial court's discretion.

¶ 104    Valladares argues implicit in the pre-instructions provided in *Klimawicze* and *Davis* is the implication that the jury will be further instructed later as to the law of accountability. Valladares contends this stands in stark contrast to how the jury here was instructed. He argues that implicit in the court's pre-instruction here was that the jury was being told the law

-18-

of accountability in total and then questioned as to whether they could follow it.

¶ 105     We see no reason to depart with our earlier holdings in *Klimawicze* and *Davis* and agree with the State that the inquiry here was not meaningfully distinct. Moreover, even if we were to find error occurred, the error was harmless. The impaneled jury was informed on three separate occasions (both during the State's and defense's closing arguments and in the jury instructions just before deliberations) that a conviction based on accountability required the defendant to intend the crimes and knowingly aid and abet. See *People v. Allen*, 272 Ill. App. 3d 394, 404 (1995) (misstatements by both attorneys as to law of accountability was considered harmless where defense counsel read proper accountability instruction to jury and trial court properly instructed jury before deliberations).

¶ 106     Valladares further contends the trial court erred in instructing the jury when it denied the defense-requested nonpattern accountability instruction. Valladares claims his proposed instruction would have aided the jury in its deliberations not only in regard to the intent requirement, but especially due to the court's pre-instruction omitting any reference to *mens rea*. Valladares argues the trial court's error was a fundamental deprivation of his right to a fair jury, a fair trial, and due process.

¶ 107     Defense counsel requested the jury be instructed in a way that would provide clarification of the mental state required to find a defendant guilty based on an accountability theory. The requested instruction, based on *People v. Taylor*, 186 Ill. 2d 439 (1999), would have informed the jury that "the State must prove the defendant was specifically intending to aid and abet in the commission of the offense." Valladares argues that particularly in light of the trial court's pre-instruction of the jury during *voir dire*, the court should have granted defense counsel's request and instructed the jury in accordance with *Taylor*.

¶ 108     Illinois Supreme Court Rule 451(a) (eff. July 1, 2006) states that in a criminal case, a pattern instruction should be given unless the instruction does not accurately state the law. In reviewing the adequacy of instructions, this court must consider the jury instructions as a whole to determine whether they fully and fairly advised the jury of the applicable law. *People v. Hines*, 257 Ill. App. 3d 238, 244 (1993). "The function of instructions is to convey to the jury the correct principles of law applicable to the evidence so the jury can apply the proper legal principles to the facts and arrive at a proper conclusion based on the law and the evidence." *People v. Peebles*, 125 Ill. App. 3d 213, 217 (1984). The decision of whether to give a nonpattern instruction falls within the discretion of the trial court. *People v. Caffey*, 205 Ill. 2d 52, 127 (2001).

¶ 109     The trial court instructed the jury with the pattern instruction on accountability. The court further instructed the jury on the presumption of innocence, the State's burden, and the elements of the crimes. Under Rule 451(a), the trial court had no reason to dispense with the pattern instruction on accountability in favor of the defense-requested nonpattern instruction. The instructions the trial court provided in this case accurately expressed to the jury the correct principles of law and as such, the trial court did not abuse its discretion by rejecting defense counsel's proffered nonpattern instruction.

¶ 111    Lastly, Valladares contends the State failed to offer sufficient evidence, independent of his confession, to establish *corpus delicti*.

¶ 112    In reviewing a sufficiency of the evidence claim, the question is whether, after viewing the evidence presented most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 358 Ill. App. 3d 927, 941 (2005). A conviction under an accountability theory requires the State to prove beyond a reasonable doubt that the defendant, with intent to promote or facilitate the commission of the offense, solicits, aids, abets, agrees or attempts to aid another person in committing the offense before or during the offense. *People v. Smith*, 278 Ill. App. 3d 343, 355 (1996); 720 ILCS 5/5-2(c) (West 2010). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises reasonable doubt of the defendant's guilt. *Jackson*, 358 Ill. App. 3d at 941. As the trier of fact, the trial court is in a superior position to assess the credibility of witnesses, resolve any inconsistencies, determine the weight to be given the testimony, as well as any reasonable inferences that can be drawn. *Jackson*, 358 Ill. App. 3d at 941.

¶ 113    The State must prove the *corpus delicti* of an offense beyond a reasonable doubt. *People v. Lambert*, 104 Ill. 2d 375, 378 (1984). Meaning, the State bears the burden to prove beyond a reasonable doubt that a crime occurred. *Id.*

"Proof of *corpus delicti* requires both proof of injury or loss, as well as proof of criminal agency. *** However, the *corpus delicti* cannot be proved by the defendant's confession alone. [Citations.] There must be either some independent evidence or corroborating evidence outside of the confession which tends to establish that a crime occurred. [Citation.] If there is such evidence, and that evidence tends to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*. [Citation.]" (Internal quotation marks omitted.) *Lambert*, 104 Ill. 2d at 378-79.

¶ 114    More recently, our supreme court explained the matter further:

"Although the corroboration requirement demands that there be some evidence, independent of the confession, tending to show the crime did occur, that evidence need not, by itself, prove the existence of the crime beyond a reasonable doubt. If the defendant's confession is corroborated, the corroborating evidence may be considered with the confession to determine whether the crime, and the fact the defendant committed it, have been proven beyond a reasonable doubt." *People v. Sargent*, 239 Ill. 2d 166, 183 (2010).

¶ 115    In *People v. Nowicki*, 385 Ill. App. 3d 53, 76 (2008), we held "the identity of the accused as the offender, the ultimate issue, is not considered part of the *corpus delicti*." (Internal quotation marks omitted.)

¶ 116    In *People v. Groves*, 294 Ill. App. 3d 570 (1998), we explained the required standard of corroboration necessary to establish *corpus delicti* in cases of accountability as established by our supreme court in *People v. Holmes*, 67 Ill. 2d 236 (1977). We stated:

"We find no case law supporting defendant's position that proof of *corpus delicti* must tend to prove accountability of the crimes charged. Accountability is the theory under which defendant was convicted, but not the crime of which he was convicted. [Citation.] In *Holmes*, the defendant argued that *corpus delicti* of accountability-murder was not proven since there must be proof that some person committed an act for which defendant was accountable. The court stated that it is not a requirement of *corpus delicti* that evidence apart from the confession tend to connect defendant to the crime charged. [Citation.] Proof of *corpus delicti* requires proof of the injury and that it was caused by criminal conduct." (Emphasis omitted.) *Groves*, 294 Ill. App. 3d at 580.

¶ 117   Just as the defendant did in *Groves*, Valladares argues his statements are the only evidence that tend to prove his intent to aid and abet in the shooting and, therefore, the evidence was insufficient to establish *corpus delicti*. Valladares misapplies *corpus delicti*. See *Groves*, 294 Ill. App. 3d at 580. As our supreme court stated in *Holmes*, and we reconfirmed in *Groves*, "it is not a requirement of *corpus delicti* that evidence apart from the confession tend to *connect* defendant to the crime charged." (Emphasis in original.) *Groves*, 294 Ill. App. 3d at 580 (citing *Holmes*, 67 Ill. 2d at 239-40).

¶ 118   We find Valladares's reliance on the Second District's decision in *People v. Rivera*, 2011 IL App (2d) 091060, and the supreme court's decision in *People v. Sargent*, 239 Ill. 2d 166 (2010), misplaced. In both cases, there was no evidence, other than the defendant's confession, to corroborate the actions necessary to sustain the convictions. *Rivera*, 2011 IL App (2d) 091060; *Sargent*, 239 Ill. 2d at 185. Here, there was sufficient evidence to establish the crimes of first degree murder and aggravated battery with a firearm beyond a reasonable doubt. The eyewitness accounts of the shooting established the *corpus delicti* of the charged crimes, *i.e.*, that Valencia was killed and Camacho was injured in a criminal manner. Dr. Arangelovich testified Valencia died from multiple gunshot wounds and that the manner of death was homicide. Camacho testified that she was shot in the neck. Valladares testified at trial that he arrived at the shooting with Gatica and is depicted in the surveillance video the jury viewed.

¶ 119   Viewing the evidence in the light most favorable to the State, we find that any rational trier of fact could have found Valladares liable under the accountability theory of first degree murder and aggravated battery with a firearm beyond a reasonable doubt. "Accountability may be established by presence at the scene of the crime, a finding that defendant had knowledge of criminal intent, flight, association with coconspirators after the incident, and a failure to report the incident." *Groves*, 294 Ill. App. 3d at 580 (citing *People v. Batchelor*, 171 Ill. 2d 367, 377-78 (1996)).

¶ 120   Valladares confessed to the police that his fingerprints would likely be found on the recovered firearm because he had given it to the shooter, Gatica. Valladares's trial testimony also corroborated his statements to the police. Further evidence, such as the surveillance video, Valladares's gang affiliation, and his phone calls with Gatica supported his convictions. Valladares fled the scene and did not report the crime. Valladares's convictions were proven beyond a reasonable doubt based on an accountability theory.

¶ 121   We reject Valladares's argument finding it lacks merit. Accordingly, we uphold

Valladares's convictions.

¶ 122                                    CONCLUSION

¶ 123     In light of the defense theory, we are unpersuaded trial counsel's representation was ineffective. The choice to proceed without filing a motion to suppress Valladares's statements to the police or limit the admission of gang evidence was a tactical decision that fit with the defendant's trial strategy. Moreover, we are unpersuaded by Valladares's contention that the cumulation of errors rendered his trial fundamentally unfair. We find the trial court's question during *voir dire* concerning accountability to be legally permissible and hold the trial court properly refused to instruct the jury with the defense-requested nonpattern instruction, where a pattern instruction on accountability properly informed the jury of the law. Finally, we hold Valladares's right to have his guilt proven beyond a reasonable doubt through evidence of *corpus delicti* outside his statement was not violated. The evidence, when viewed in the light most favorable to the State, supports Valladares's convictions of first degree murder and aggravated battery with a firearm. For the foregoing reasons, we affirm the trial court's judgment.

¶ 124     Affirmed.