2020 IL App (1st) 180766-U

No. 1-18-0766

Order filed October 29, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 CR 05012 |
| | ) | |
| DWAYNE JAMES, | ) | Honorable |
| | ) | Lauren Edidin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Hall concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm defendant's convictions. The record does not support his allegations of ineffective assistance of trial counsel. And the trial court did not abuse its discretion in admitting other crimes evidence. Regardless, because the trial court indicated that it did not consider the other crimes evidence in reaching its verdict at defendant's bench trial, any error in its admission was harmless.

¶ 2   Following a bench trial, defendant Dwayne James was convicted of three counts of aggravated criminal sexual assault and one count of aggravated domestic battery and was sentenced to eleven years in prison. On appeal, defendant argues that the trial court erred in

allowing the victim to testify about a prior, uncharged act of sexual assault he committed against her. He also contends that his trial counsel was constitutionally ineffective. We reject defendant's contentions and affirm the trial court's judgment.[1]

¶ 3                                        I. BACKGROUND

¶ 4      Defendant was charged with six counts of aggravated criminal sexual assault (720 ILCS 5/11–1.30 (West 2012)) and one count of aggravated domestic battery (720 ILCS 5/12–3.3 (West 2012)). The charges arose from an incident between defendant and C.S. on or about February 2, 2013. Three aggravated criminal sexual assault counts alleged that defendant forcibly placed his penis in C.S.'s mouth and three alleged that he forcibly placed his penis in C.S.'s vagina. Each count further alleged one of three aggravating circumstances: that defendant caused C.S. bodily harm, threatened or endangered C.S.'s life, or committed the offense while engaged in aggravated domestic battery. See 720 ILCS 5/11–1.30(a)(2), (3), (4) (West 2012). The aggravated domestic battery count alleged that defendant strangled C.S. and that he and C.S. were family or household members because they share two children. See 720 ILCS 5/12–3.3(a-5) (West 2012).

¶ 5      Before trial, the State filed a motion to admit evidence that defendant committed a prior sexual assault against C.S. a year before the charged offenses. The State argued that the evidence was relevant to proving defendant's motive, intent, absence of mistake, and propensity to commit the charged offenses. Defense counsel objected to admission of the evidence. Counsel argued that C.S.'s account of the event was unreliable because she did not contemporaneously report it to police. Counsel also argued that admission of the evidence would be unduly prejudicial. The trial court found the evidence relevant and concluded that its probative value was not outweighed by

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

the danger of unfair prejudice. But the court reserved a final ruling on the admissibility of the evidence until assessing its reliability at a separate hearing. When defendant chose a bench trial, the parties agreed that the court could make the evidentiary ruling at trial. The matter eventually proceeded to trial before a new judge.

¶ 6    At trial, C.S., her friend, Amanda, and an investigating detective testified for the State. Defendant testified on his own behalf. C.S. testified that defendant previously sexually assaulted her in January or February 2012. On that occasion, defendant was at C.S.'s apartment delivering a child support payment. He attempted to become affectionate with C.S., but she rebuffed his advances. Defendant then became angry. He dragged C.S. onto a couch by her hair, ripped down her pants, and forced his penis into her vagina. He told C.S. he would kill her and the children if she told anyone what happened. C.S. did not report the assault because she feared defendant would make good on his threat.

¶ 7    C.S. testified that defendant sexually assaulted her again about a year later. On February 1, 2013, defendant told C.S. he wanted to drop off Christmas presents for the children, who were then ages seven and one. C.S. arranged for defendant to come to her apartment that evening. Because she was afraid to be alone with defendant after the prior sexual assault, C.S. asked Amanda to come over as well. Amanda came to C.S.'s apartment around 6 p.m. and stayed until around 10 p.m. During that time, C.S. received several text messages from defendant saying he was running late but that he would be there soon. C.S. eventually told defendant not to come because Amanda had to leave and the children were going to sleep.

¶ 8    Later that evening, C.S. was awakened by several text messages and phone calls from defendant. (The State introduced photographs of the text messages discussed in this order as

exhibits at trial.) At 11:11 p.m., defendant texted: "I'm going to b[e] pulling up in 15 min[utes]." At 11:47 p.m., he wrote: "I'm walking up to the door now[,] please answer." At 11:55 p.m., he wrote: "Open the door[,] I'm freezing." And at 11:57 p.m., he sent a picture of the presents he brought and wrote: "It's cold." C.S. testified that she did not respond to defendant's text messages or answer his phone calls because she was in bed and did not want to let him in the apartment. However, when defendant also began to bang on C.S.'s bedroom window and sliding glass patio door, she relented and let him in.

¶ 9 Defendant told C.S. that his ride had left and asked to wait inside for a while. C.S. let him do so. But fearing for her safety, C.S. went back to her bedroom and locked the door, telling defendant to text her when he left. When defendant was still there at 12:21 a.m., C.S. sent him a text message, telling him he had to leave because someone was coming over in the morning. At 12:41 a.m., defendant responded via text: "I'm [a]bout to get ready to go[,] so [you] can lock the door." C.S. stayed in the bedroom because she wanted to be sure defendant was gone before she came out. At 12:50 a.m., defendant sent another text: "[Alright], I'm leaving." Again, C.S. stayed in the bedroom. Finally, at 12:56 a.m., defendant texted: "Lock the door[,] I left." Thinking defendant was gone, C.S. came out of the bedroom.

¶ 10 When C.S. went to lock the door, she saw it was already locked. She turned around and saw defendant still inside the apartment. She ran back to the bedroom and tried to close the door, but defendant chased after her and pushed the door open. Defendant grabbed C.S. in a bear hug and tried to kiss her. C.S. struggled but was unable to get away. Defendant pulled down C.S.'s tank top and bra. When C.S. continued to resist, defendant slapped her face and put his hand over her mouth with such force that it caused C.S.'s teeth to puncture the inside of her lip.

¶ 11    Defendant pushed C.S. to the ground at the foot of the bed and forced his penis into her mouth. Because C.S. was seated on the ground with the mattress behind her head, she could not move her head backwards. But she was able to move her head to the side, which enabled her to bite defendant's left thigh. That caused defendant to jump back, and C.S. was able to stand up.

¶ 12    Undeterred, defendant charged at C.S. He put his hand around her neck and choked her. He then forced C.S. onto the bed and straddled her. He pulled down C.S.'s pants and forced his penis into her vagina. As C.S. continued to struggle and cry, defendant ripped out a clump of her hair. While still in the act, defendant told C.S. he did not want her to be with anyone else and would kill her and the children if she told anyone what he did.

¶ 13    When defendant finally stopped, C.S. ran to the bathroom and locked the door, waiting for defendant to leave. She stayed in the apartment because she did not want to leave her children and did not call the police because she feared what defendant would do. C.S. eventually came out of the bathroom while defendant remained in the apartment. She went to the kitchen to get an ice pack for her lip. When their youngest child began to cry, defendant went to the children's room. He carried the baby to C.S.'s bedroom. C.S. then took the baby from defendant, and she and defendant sat on the bed as she held the baby. After defendant eventually left, C.S. was able to put the baby back to sleep. She did not call the police at that time because she was still processing what had happened.

¶ 14    Over the next several hours, defendant and C.S. exchanged additional text messages. At 2:16 a.m., defendant wrote: "I'm sorry[.] [I] truly am[.] [I don't know] who I was. I love [you] so much[.] I just d[o]n't want [you] with anybody else." At 4.33 a.m., defendant wrote: "I can't sleep[.] I just keep thinking about you[.] [S]o sorry[.] I love you." C.S. responded at 7:17 a.m.,

writing: "Well[,] I suggest [you] never call or text me again [and you] will never see me or [your] kids again. [I]f [you] do try [and] contact me[,] [I] will file a police rep[o]rt. [You] have issues [and you] need help." At 8:24 a.m., defendant wrote: "I already told [you] what [I'm going to] do if [you] do that." At 8:25 a.m., C.S. responded: "[OK], more of a reason to make a police report [and] get a restraining order." At 8:26 a.m., defendant replied: "[I don't care, you] gotta take off of work to go to court for that[,] so go ahead[,] I ain't worried."

¶ 15    Around 8 a.m., Amanda returned to C.S.'s apartment to pick up her wallet, which she left behind the night before. Amanda stayed for only a minute or two because she was late for work. Amanda testified that C.S.'s lip was puffy, her hair was messy, and she looked like she had been crying. When Amanda asked C.S. if she was okay, C.S. turned her head and said yes.

¶ 16    Around the same time, C.S. spoke with her sister by phone. She told her sister what had happened and discussed whether she should call the police. C.S. initially did not want to call the police because she was ashamed and embarrassed. She was also fearful that defendant would make good on his threat to kill her and the children if she reported the assault. But after speaking with her sister, C.S. decided to call the police.

¶ 17    Before doing so, C.S. took a shower and cleaned her apartment. She testified that she "felt gross" and that her apartment was dirty and strewn with wrapping paper. She found a condom wrapper on the floor of her bedroom, which she threw away. She did not know whether defendant used a condom during the assault. Officers who searched C.S.'s apartment later that day found the condom wrapper, but no condom.

¶ 18    After speaking with police, C.S. went to a hospital, where a nurse administered a "rape kit." The process included the collection of oral and vaginal swabs. The parties stipulated that

semen was detected on the vaginal swabs and that the DNA profile of the semen matched defendant's DNA profile. The same day, police took several photographs of C.S.'s body, which were introduced as exhibits at trial. The photographs show a cut on the inside of C.S.'s upper lip, a scratch on her neck, and a bruise on her knee. C.S. testified that the bruise was caused by defendant forcing her legs apart during the assault.

¶ 19     Defendant was arrested on February 6, 2013. During processing, police took several photographs of defendant's body, which were also introduced at trial. The photographs depict scratches or scabs on defendant's right hand, lower back, and buttocks and an abrasion on his left thigh, where C.S. testified she bit him.

¶ 20     On cross-examination, C.S. testified that she continued to speak with and see defendant after the 2012 assault. She testified that she did not speak with him often but that she did allow him to come to her apartment to pick up their son for basketball practice. She acknowledged not telling the police or anyone else about the 2012 assault until she later reported the 2013 assault. As for the incident in 2013, C.S. denied having given defendant a condom to wear. She also denied searching through defendant's phone, finding information about other women that upset her, and then tussling with defendant for the phone.

¶ 21     At the close of the State's case, the trial court revisited the State's motion to allow C.S.'s testimony about defendant's prior sexual assault. Defense counsel urged the court to exclude the testimony. Counsel stressed that C.S. did not provide a specific date on which the prior assault allegedly occurred and did not contemporaneously report it to police or anyone else. Counsel also noted that C.S. spent time with defendant and allowed him to interact with their children even after the alleged prior assault. Over defense counsel's objection, the court admitted the evidence. The

trial judge stated that she agreed with her predecessor's findings that evidence of defendant's prior sexual assault against C.S. was relevant and that its probative value was not outweighed by the danger of unfair prejudice. In addition, the judge found C.S.'s testimony about the prior sexual assault to be reliable.

¶ 22    Defendant then took the stand. He testified that he went to C.S.'s apartment around 11 p.m. to deliver Christmas gifts for the children. When he arrived, C.S. directed him to her bedroom so as not to wake the children. After speaking for a few minutes, they began to kiss and eventually had consensual sex. When they were done, defendant went to the bathroom. A short time later, C.S. confronted defendant about something she had found on his phone. A heated argument and tussle over the phone ensued. Defendant claimed that C.S. likely sustained her injuries during that tussle. He testified that the text messages he sent C.S. saying he was sorry were intended as apologies for the things C.S. found on his phone and the hurtful things he said during their argument.

¶ 23    On cross-examination, defendant testified that he did not initially wear a condom but that he eventually put one on. He denied that C.S. bit his thigh. He testified that the mark on his thigh was likely caused by him scratching himself. And he testified that the marks on his lower back and buttocks could have been caused while he was playing basketball or during his consensual sex with C.S. Although defendant acknowledged on direct examination that he sent C.S. text messages before arriving at her apartment and after leaving, on cross-examination he initially denied having sent any messages before arriving at C.S.'s apartment. After looking at the State's exhibits, however, he conceded that he could have sent the messages but said he was unsure due to the passage of time. He also explained that his message telling C.S. that she knew what he would do

if she filed a police report was intended as a threat to post nude pictures of C.S. online, not to kill her or their children.

¶ 24    After taking a short recess, the trial court announced its verdict. The court began by noting that it had not considered the evidence of defendant's prior sexual assault in reaching its verdict. The court explained that C.S. testified "credibly and honestly" and that her testimony was supported by "abundant corroboration," including defendant's text messages and the injuries sustained by C.S. and defendant. Meanwhile, the court found that defendant was not credible and that his testimony was "contradictory and implausible." The court found defendant not guilty of the three counts of aggravated criminal sexual assault based on penis-to-mouth contact, but guilty of the three counts of aggravated criminal sexual assault based on penis-to-vagina contact and the single count of aggravated domestic battery.

¶ 25    Following the verdict, defendant retained new counsel and filed a motion for a new trial. He argued that the court erred in allowing C.S. to testify about the prior sexual assault as other crimes evidence. He also argued that his trial counsel rendered ineffective assistance in numerous respects.

¶ 26    First, defendant alleged that trial counsel failed to adequately prepare him for trial. He alleged that counsel only met with him "in [the] hallway for approximately five minutes before [the] trial began" and did not show him any of the State's discovery materials prior to trial, including the photographs of his text messages and his and C.S.'s injuries. He argued that he was caught by surprise when the State questioned him about the text messages on cross-examination, which led him to damage his credibility by testifying that he did not recall sending some of the messages. He also argued that, by failing to show him the photograph depicting a mark on his thigh

allegedly caused by C.S. biting him, counsel missed an opportunity to question C.S. about the impossibility of her being able to bite him under the circumstances she described.

¶ 27    Second, defendant alleged that trial counsel failed to adequately impeach C.S.'s credibility and challenge the State's case. In particular, he alleged that counsel failed to present two photographs taken after the alleged prior assault—one allegedly showing defendant and C.S. in bed together and the other allegedly showing defendant and C.S. with their daughter—that would have cast doubt on C.S.'s testimony that their 2012 encounter was nonconsensual and caused C.S. to subsequently fear defendant. He also argued that counsel should have done the following: ask C.S. whether she was intoxicated during their 2013 encounter; ask C.S. or her sister whether her sister had a sexual relationship with defendant; ask C.S. whether she used a diaphragm for birth control and whether she gave defendant a condom during their 2013 encounter after defendant told her he did not feel her diaphragm; argue that C.S. could not have bit defendant's thigh under the circumstances she described; and call an unidentified witness who would have allegedly testified that defendant did not appear sweaty, disheveled, or red-faced after leaving C.S.'s apartment. Finally, defendant argued that trial counsel was ineffective for failing to ask him any "humanizing" questions about his employment, education, and charity work.

¶ 28    Because defendant's ineffective assistance claims relied on matters outside the record, the trial court concluded that an evidentiary hearing was required. At the hearing, the State called defendant's trial counsel. Defendant did not testify, call witnesses, or present evidence at the hearing, choosing instead to rest on the allegations in his motion, which he verified as true and correct under 735 ILCS 5/1–109 (West 2016).

¶ 29    Trial counsel testified that he began to represent defendant more than two years before trial. In that period, defendant came to counsel's office at least five or six times. They also met for 10 to 15 minutes at a time before or after court appearances. Defendant came to counsel's office for at least two meetings devoted to trial preparation. Each of those meetings lasted for at least an hour. One of these meetings took place about a month before trial and one took place the week of trial.

¶ 30    Counsel testified that the purpose of the final pre-trial meeting was to "finalize going through discovery materials and prepar[e] for testimony." At the meeting, counsel and defendant went over the State's evidence and discussed defendant's potential testimony. Counsel confirmed that he showed defendant the police reports, witness statements, grand jury transcripts, text messages, and photographs the State had tendered in discovery.

¶ 31    As for the text messages, counsel recalled telling defendant "that a few of [the messages] looked suspicious, that they looked like admissions, and [that] unless [they] had a viable strategy to do away with them [they] were going to be in trouble." Counsel testified that he also showed defendant the photograph of the injury on his thigh and discussed how defendant might address the photograph on the stand. Counsel recalled that defendant told him the injury was caused by C.S. "liking rough sex."

¶ 32    Counsel testified that he refrained from questioning C.S. about the alleged prior sexual assault so as to not risk "highlight[ing]" that incident. He also testified that he repeatedly asked defendant for potential witnesses or favorable evidence but that defendant never provided such information. Counsel testified that defendant never produced any photographs of him and C.S. after the alleged 2012 assault. Nor did defendant tell counsel that C.S. generally used a diaphragm

for birth control or that he told her that he did not feel the diaphragm on the night of their 2013 encounter. Defendant likewise did not tell counsel that C.S. was intoxicated nor did he suggest C.S.'s sister as a potential witness due to his having been involved in a sexual relationship with her.

¶ 33    After argument, the trial court denied defendant's motion. With respect to defendant's claim that the court erred in allowing C.S. to testify about the prior sexual assault, the court reiterated that it did not consider that evidence in reaching its verdict because the other evidence at trial overwhelmingly established defendant's guilt. The trial court also rejected defendant's ineffective assistance claims. The court recounted trial counsel's testimony about "how he prepared [defendant] for court, how he had asked for additional evidence or witnesses, [and] that he went over text messages and photographs with the defendant and prepared him for trial." The court noted that counsel's testimony contradicted the allegations in defendant's motion. And in light of that testimony and the court's observations of counsel at trial, the court concluded that defendant had not established that counsel rendered ineffective assistance.

¶ 34    After hearing arguments in aggravation and mitigation, the trial court imposed defendant's sentence. Defendant then filed a timely notice of appeal.

¶ 35                                II. ANALYSIS

¶ 36                    A. Ineffective Assistance of Counsel

¶ 37    Defendant argues that he is entitled to a new trial due to ineffective assistance of trial counsel. To prevail on this claim, defendant must show that trial counsel performed deficiently and that he suffered resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, defendant "must show that counsel's representation fell below

an objective standard of reasonableness." *Id.* at 688. When assessing counsel's performance, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that counsel's "challenged action[s] might be considered sound trial strategy." (Internal quotation marks omitted.) *Id.* at 689. To demonstrate prejudice, defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different." *Id.* at 694. Because the trial court rejected defendant's ineffective assistance claims after an evidentiary hearing, we apply "a bifurcated standard of review, wherein we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel's actions support an ineffective assistance claim." *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008).

¶ 38    Defendant first contends that counsel failed to adequately prepare him for trial. He alleges that counsel only met with him in the hallway prior to trial for five minutes and did not show him the State's discovery materials before trial, including the text messages he sent to C.S. and photographs of his and C.S.'s injuries. But trial counsel flatly denied these allegations at the post-trial evidentiary hearing. Counsel testified that he met with defendant at least five or six times at his office in the two years preceding the trial and that they also conferred for 10 to 15 minutes before or after pre-trial court appearances. Counsel further testified that he had at least two in-office meetings with defendant to prepare for trial, one about a month before trial and another on the week of trial. Counsel testified that each of these trial preparation meetings lasted at least an hour.

¶ 39 Counsel also refuted defendant's contention that he was not shown the State's discovery materials before trial, including his text messages and the photographs of both his and C.S.'s injuries. In particular, counsel testified that he showed defendant the police reports, witness statements, grand jury transcripts, text messages, and photographs that were tendered by the State in discovery. (Defendant also contends that counsel did not show him pictures of the Christmas presents that the State used at trial. But the only picture of Christmas presents introduced at trial was the picture included in one of defendant's text messages.) With respect to the text messages, moreover, counsel testified that he reviewed them with defendant and warned him that they could be damaging without a viable strategy to address them. Counsel also testified that he showed defendant the photograph depicting an injury on his thigh and discussed with defendant his explanation for the injury.

¶ 40 The trial court granted defendant an evidentiary hearing on his claims, but defendant opted not to testify at the hearing, leaving trial counsel's testimony unrebutted. Although the trial court did not make an express credibility finding, we think it clear that the court implicitly credited trial counsel's testimony when, in the course of rejecting defendant's claims, the court recounted counsel's testimony and noted that the testimony contradicted defendant's allegations. Because that factual finding is not against the manifest weight of the evidence, we defer to it. See *Nowicki*, 385 Ill. App. 3d at 81. In light of trial counsel's unrebutted and credited testimony, defendant has not met his burden of establishing that counsel was deficient in his preparation of defendant for trial. See *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 52 ("The defendant bears the burden of demonstrating he received ineffective assistance of counsel.").

¶ 41    Next, defendant contends that trial counsel failed to adequately cross-examine C.S. and challenge the State's case with available evidence. But the record refutes these allegations as well. Defendant asserts that counsel failed to challenge C.S. concerning the supposed impossibility of her having bit defendant's thigh in the manner she described. At trial, C.S. testified that, after defendant pushed her to the ground and forced his penis into her mouth, she turned her head to the side and bit his thigh. Defendant contends that C.S. could not have bit his thigh in this manner because she testified that her head was immobilized by the mattress behind her. But C.S. testified that she could not move her head *backwards* due to the mattress being behind her. The mattress did not similarly prevent her from moving her head to the *side*, which was what enabled her to bite defendant's thigh. We see no internal inconsistency in C.S.'s testimony nor any obvious avenue of effective cross-examination on this point.

¶ 42    Defendant further argues that counsel failed to effectively cross-examine C.S. about her allegations that defendant previously sexually assaulted her and failed to present evidence demonstrating the consensual nature of that encounter. In particular, defendant contends that counsel should have introduced two photographs of him and C.S. taken after the 2012 encounter that would allegedly refute C.S.'s allegation that the encounter was nonconsensual and caused C.S. to subsequently fear defendant. But at the evidentiary hearing, trial counsel testified that defendant never provided him any photographs. Defendant did not testify at the hearing or introduce any evidence to contradict counsel's testimony. To this day, there is no evidence in the record that the claimed photographs exist, much less that defendant provided them to counsel before trial. As noted, the trial court implicitly credited trial counsel's evidentiary hearing testimony, and that credibility finding was not against the manifest weight of the evidence. In light of counsel's

unrebutted and credited testimony that defendant did not give counsel any photographs of defendant and C.S., counsel cannot be deemed ineffective for failing to present such evidence at trial.

¶ 43     Defendant relatedly argues that counsel was ineffective for failing to cross-examine C.S. about the credibility and reliability of her testimony concerning the prior assault allegation. But defendant does not identify any specific questions or areas of inquiry that would have undermined C.S.'s credibility or reliability. His sole suggestion is that counsel should have asked C.S. whether the 2012 encounter was consensual, but on direct examination she unequivocally described the encounter as both nonconsensual and violent. We cannot fathom how simply asking her whether the encounter was consensual on cross-examination would have led to an answer that undermined her credibility. Regardless, trial counsel testified that he made the considered decision to refrain from questioning C.S. about the prior assault allegation to avoid drawing added attention to that incident. That is precisely the kind of strategic decision that is "generally immune from claims of ineffective assistance of counsel." *People v. Dupree*, 2018 IL 122307, ¶ 44. Defendant has not overcome the "strong presumption" that counsel's decision not to delve into the details of the prior assault "might be considered sound trial strategy." (Internal quotation marks omitted.) *Strickland*, 466 U.S. at 689.

¶ 44     Defendant also contends that trial counsel was ineffective for failing to pursue a number of other areas of inquiry. He argues that counsel should have questioned him or C.S. about whether C.S. was intoxicated; that counsel should have questioned C.S. about her method of birth control and whether she gave defendant a condom after he told her that he did not feel her diaphragm; that counsel should have asked C.S. or her sister whether C.S.'s sister and defendant had been involved

in a sexual relationship; and that counsel should have called a witness to describe defendant's appearance shortly after he left C.S.'s apartment. But again, trial counsel's unrebutted and credited testimony at the evidentiary hearing was that defendant never told him about any of these matters.

¶ 45 Counsel testified that defendant did not identify C.S.'s sister as a potential witness even though counsel repeatedly asked defendant whether he was aware of potential witnesses or other favorable evidence. Nor does anything in the record establish that defendant otherwise informed counsel of the alleged sexual relationship between defendant and C.S.'s sister. The same is true of the unnamed witness who allegedly saw defendant shortly after he left C.S.'s apartment. Counsel testified that, despite his repeated requests, defendant never provided him the names of any potential witnesses. Indeed, even after he was given the opportunity to develop his claims at an evidentiary hearing, defendant still has not identified this supposed witness or provided any evidence establishing what his testimony would have been. In addition, counsel testified, without contradiction, that defendant never told him that C.S. was intoxicated on the night of the alleged assault. Counsel also testified, again without contradiction, that defendant did not tell him that C.S. generally used a diaphragm for birth control or that she gave him a condom to wear during their 2013 encounter after he told her that he did not feel the diaphragm.

¶ 46 Defendant next argues that trial counsel was ineffective for failing to ask him "humanizing" questions about his employment, education, and charity work to bolster his credibility. But defendant offers no support for the proposition that failing to ask such questions amounts to objectively unreasonable performance for constitutional purposes. See *Strickland*, 466 U.S. at 687 (demonstrating deficient performance requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment").

Regardless, we note that counsel did in fact ask defendant about his employment, and defendant responded that he worked for a travel basketball organization, where he coached, trained, and "mentor[ed] young kids." Defendant does not suggest how further questions about his education or charity work would have bolstered his credibility. Indeed, he does not say what his answers to such questions would have been. There is thus nothing in the record to suggest, much less demonstrate, a reasonable probability that the trial court would have credited defendant's testimony and found him not guilty of the charged offenses if counsel had asked additional "humanizing" questions, particularly in light of the court's finding that defendant's testimony about the events in question was "contradictory and implausible."

¶ 47    Finally, defendant argues that trial counsel was ineffective for failing to file a "motion to suppress" or otherwise object to C.S.'s testimony about the alleged prior assault. But there was no need for counsel to move to suppress that testimony. The State itself put the issue before the court when it filed a motion to admit the testimony as other crimes evidence. And while trial counsel did not file a written response to the motion, he orally opposed admission of the other crimes evidence at both the pre-trial hearing on the issue and after C.S. testified at trial, when the court revisited the question. Defendant has not shown that counsel's handling of the issue was objectively unreasonable. Nor has he demonstrated prejudice. As we discuss below, the trial court did not err in admitting the evidence, and defendant has not shown any reasonable probability that a more fulsome objection from trial counsel would have altered the court's conclusion. Moreover, in light of the overwhelming evidence of defendant's guilt aside from the other crimes evidence, and the trial court's express assurance that it did not consider the other crimes evidence in reaching

its verdict, there is no reasonable probability that defendant would have been acquitted even if the other crimes evidence had been excluded.

¶ 48                                  B. Other Crimes Evidence

¶ 49    Defendant also contends that the trial court erred in allowing C.S. to testify about the prior sexual assault. As recounted above, the trial court found that evidence of the prior sexual assault was relevant on the issues of defendant's intent, motive, and absence of mistake, as well as his propensity to commit the charged offenses, and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Defendant contests only the last aspect of this ruling, arguing that the trial court erred in weighing the probative value and potentially prejudicial effect of the other crimes evidence. We review the trial court's decision for an abuse of discretion. *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010) ("The admissibility of other-crimes evidence is within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of that discretion.").

¶ 50    Evidence that a defendant has committed other crimes or prior bad acts is generally inadmissible to prove the defendant's propensity to commit a charged offense. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith [with certain exceptions discussed below]."). Such evidence may be admitted, however, "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* But "[e]ven if offered for a permissible purpose, such evidence will not be admitted if its prejudicial effect substantially outweighs its probative value." *Dabbs*, 239 Ill. 2d at 284; see Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("Although relevant, evidence may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.")

¶ 51    Two exceptions to the general rule against the use of other crimes evidence to establish propensity are relevant here. Under section 115–7.3 of the Code of Criminal Procedure (Code), when a defendant is accused of any one of several enumerated sex offenses, including aggravated criminal sexual assault, evidence that the defendant has previously committed one of the enumerated sex offenses "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant," including propensity. 725 ILCS 5/115–7.3(b) (West 2012). Similarly, under section 115–7.4 of the Code, when a defendant "is accused of an offense of domestic violence *** evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115–7.4(a) (West 2012). Both statutory provisions direct the trial court, when "weighing the probative value of the evidence against undue prejudice to the defendant," to consider its "proximity in time to the charged or predicate offense," its "degree of factual similarity to the charged or predicate offense," and any "other relevant facts and circumstances." 725 ILCS 5/115–7.3(c) (West 2012); 725 ILCS 5/115–7.4(b) (West 2012).

¶ 52    As noted, defendant does not contest that evidence of his alleged prior sexual assault of C.S. was relevant to proving his intent, motive, and absence of mistake with respect to the charged offenses. Nor does he dispute that the prior sexual assault qualifies as both an enumerated sex offense under section 115–7.3 and an offense of domestic violence under section 115–7.4 that may

be admissible to establish his propensity to commit similar offenses. Rather, his sole argument is that the evidence of his prior sexual assault carried a danger of unfair prejudice that substantially outweighed the evidence's probative value. Having considered the relevant statutory factors, we disagree.

¶ 53    First, C.S. testified that the prior sexual assault took place about a year before the charged offenses. There is no bright-line rule establishing when a prior crime or bad act is too old to be admitted as other crimes evidence. *People v. Donoho*, 204 Ill. 2d 159, 183-84 (2003). We note, however, that courts have "affirmed [the] admission of other-crimes evidence over 20 years old" where the evidence was "sufficiently credible and probative." *Id.* at 184. Here, the relatively close proximity in time between the alleged prior sexual assault and the charged offenses weighs in favor of admissibility.

¶ 54    Second, the degree of factual similarity between the prior assault and the charged offenses also supports admissibility. Both the prior assault and the charged offenses involved defendant attacking C.S. in her own apartment after coming to drop something off—a child support payment in one case and Christmas presents for their children in the other. And contrary to defendant's assertion, both incidents involved violent sexual assaults, although the precise details of each assault varied. C.S. testified that, in the 2012 incident, defendant pulled her onto a couch by her hair, ripped down her pants, and forced his penis into her vagina. In the 2013 incident, as described by C.S., defendant grabbed her in a bear hug, pulled down her tank top and bra, slapped her face and covered her mouth with his hand, pushed her to the ground and forced his penis into her mouth, put his hand around her neck and choked her, and eventually pulled down her pants and forced his

penis into her vagina. Finally, in both instances, defendant threatened to kill her and their children if she reported his assaults.

¶ 55    Defendant points to several differences between the two incidents. He notes that the incident in 2012 involved only vaginal penetration whereas C.S. testified that the 2013 incident involved both vaginal and oral penetration. He also asserts that the 2012 assault was less violent than the 2013 assault. We acknowledge that, as described by C.S., the 2013 assault included several violent acts by defendant—such as slapping C.S.'s face, covering her mouth with his hand, and choking her—that were not present in the 2012 assault. But "[t]he existence of some differences between the prior offense and the current charge does not defeat admissibility because no two independent crimes are identical." *Donoho*, 204 Ill. 2d at 185. Rather, where other crimes evidence is offered, as it was here, for a purpose other than establishing *modus operandi*, "mere general areas of similarity will suffice to support admissibility." (Internal quotation marks omitted.) *Id.*at 184. We think the general areas of similarity between the alleged prior assault and the charged offenses that we outlined above were more than sufficient to support admissibility of the other crimes evidence here.

¶ 56    Nor do any other relevant facts or circumstances weigh against admissibility. Defendant argues that C.S.'s testimony about the prior assault should not have been admitted because the allegations were uncharged and unproven. But the fact that defendant was never charged with the prior assault is immaterial. See *People v. Johnson*, 368 Ill. App. 3d 1146, 1159 (2006) ("Whether defendant was ever arrested or charged for his conduct that constitutes other-crimes evidence is totally irrelevant to a determination of whether that evidence is admissible."). Moreover, "the State does not need to prove defendant's involvement in [the] other crimes beyond a reasonable doubt

but instead such proof must be 'more than a mere suspicion.'" *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 52 (quoting *People v. Thingvold*, 145 Ill. 2d 441, 456 (1991)). Here, C.S.'s testimony about the prior assault, which the trial court found reliable, adequately demonstrated defendant's commission of that assault by more than mere suspicion. For all these reasons, we cannot say that the trial court abused its discretion in admitting C.S.'s testimony about defendant's alleged prior assault as other crimes evidence.

¶ 57    We note, however, that even if the trial court had abused its discretion in admitting the evidence, the error was harmless. As with other evidentiary errors, an error in the admission of other crimes evidence "is harmless if there is no reasonable probability that the [factfinder] would have acquitted the defendant absent the error." *People v. Wesley*, 2019 IL App (1st) 170442, ¶ 27 (citing *In re E.H.*, 224 Ill. 2d 172, 180 (2006)). The trial judge, as the finder of fact at defendant's bench trial, expressly stated that she had not considered the other crimes evidence in reaching her verdict. We have no reason to doubt that assurance.

¶ 58    As the court explained, C.S. testified "credibly and honestly" about the charged assault, while defendant's testimony was "contradictory and implausible." We accept those credibility determinations because they are not against the manifest weight of the evidence. See *People v. Swenson*, 2020 IL 124688, ¶ 19 ("The trial court's underlying credibility and factual findings [may be] reversed only if they are against the manifest weight of the evidence."). C.S.'s testimony was also supported by "abundant corroboration," including photographic evidence of injuries to her and defendant that were consistent with her account of events and defendant's text messages in the hours after the assault, in which he apologized to C.S. and reminded her of his threat to kill her and their children if she reported the assault to police. In light of the overwhelming evidence of

defendant's guilt aside from the other crimes evidence, there is no reasonable probability that the trial judge would have acquitted defendant if the other crimes evidence had been excluded. Thus, even if the court had erred in admitting that evidence, the error was harmless. *Wesley*, 2019 IL App (1st) 170442, ¶ 27.

¶ 59                                   III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 61    Affirmed.