2021 IL App (1st) 192060-U

No. 1-19-2060

Order filed June 30, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 4943 |
| | ) | |
| YOLANDA NEELY, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*: The State proved defendant's guilt of aggravated battery and aggravated discharge of a firearm under a theory of accountability beyond a reasonable doubt. The trial court did not err in failing to appoint new counsel following a preliminary *Krankel* hearing.

¶ 2      Following a bench trial, defendant Yolanda Neely was found guilty of aggravated battery with a firearm and aggravated discharge of a firearm under a theory of accountability.[1] The court sentenced defendant to 90 months' concurrent imprisonment on both counts. On appeal, defendant argues that the State failed to prove her guilt beyond a reasonable doubt and that the trial court erred by not appointing independent counsel on her *pro se* claims of ineffective assistance of counsel, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). We affirm.[2]

¶ 3      Defendant was charged by indictment with two counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2016); (720 ILCS 5/9-1(a)(1) (West 2016)), and one count each of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)), connected to the shooting of Andre Carothers.[3]

¶ 4      Defendant's bench trial proceeded simultaneously with the jury trial of co-offender Eugene Brown, who is not a party to this appeal.

¶ 5      At a pretrial hearing, defendant's private counsel explained that defendant demanded trial and had indicated that, while intoxicated, she was coerced into giving a videotaped statement to police. Counsel stated that after viewing the statement and speaking with defendant, he did not believe there were grounds to suppress the statement, but he would challenge its weight at trial. On the date of trial, the State noted it had offered defendant to plead guilty to a probational count

---

[1] Defendant's last name is spelled both Neely and Neeley in the record. We adopt the spelling from the notice of appeal.

[2] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[3] Carothers's last name is spelled various ways throughout the record. We adopt the spelling from his testimony.

of aggravated discharge of a firearm in exchange for her testimony, and defendant confirmed to the court she wished to proceed to trial.

¶ 6    Andre Carothers testified that he was convicted in 2004 for criminal drug conspiracy and manufacture or delivery of cocaine. Eugene Brown and defendant, who dated, were his old friends and he identified them in court. Carothers knew defendant by the name "Yoshi." On October 12, 2017, Carothers drank liquor at the home of Latoyce Pinckney, his ex-girlfriend. Carothers denied that Pinckney told him that she had a problem with defendant earlier that day.

¶ 7    Carothers left Pinckney's home and walked 150 or 200 feet to Whipple Street and Madison Street, where he awaited a ride home. A liquor store, Rothschild's, was located at the corner. It was dark, but there were streetlights. Someone shot Carothers, but Carothers denied knowing or remembering the shooter's identity. He did not recall seeing Brown exit a red Pontiac Montana minivan on Whipple prior to the shooting.

¶ 8    On October 19, 2017, Carothers spoke with police officers in the hospital, but he did not recall what he told them. Carothers testified that he was "under the influence" when he was shot, the officers told him who was involved in the shooting, and he did not identify Brown as his shooter before the officers asked any questions. On November 5, 2017, Carothers met Detective Brian Drees at the police station. Carothers acknowledged that he signed photographs of defendant and Brown at the police station. While he did not tell Detective Drees that he did not recall what happened, he denied recalling what he told Detective Drees.

¶ 9    Carothers agreed that, before trial, the prosecutor had shown him a video which depicted Carothers speaking with Detective Drees and an assistant State's Attorney (ASA), and admitted that the video did not depict him stating he did not recall what happened. However, when asked

about specific statements he made to the ASA during the video, Carothers did not recall making them.

¶ 10 The court admitted the videotaped statement into evidence and the State published the video, which is included in the record on appeal. In the video, ASA Jason Fisher identifies himself, Detective Drees, and Carothers. Carothers states he has known Brown for about 40 years, and the two were once best friends. Carothers identifies and signs photographs of Brown and a woman he knows as "Yoshi," who was in a relationship with Brown and whom Carothers had seen regularly for three or four years.

¶ 11 Carothers explains that, around 8:29 p.m. on October 12, 2017, he was in an alley off Whipple and saw Yoshi driving a maroon Montana van approximately five to seven feet away, with Brown in the passenger seat. There were streetlights and alley lights. Carothers exited the alley and walked towards Whipple and Madison, where Rothschild's is located, to await a ride. The van was parked on the side of Rothschild's. He then saw Brown walking down Whipple towards Madison.

¶ 12 Brown confronted Carothers regarding a fight between Yoshi and Carothers's ex-girlfriend, of which Carothers was unaware. Carothers and Brown were three or four feet apart and no one else was on the sidewalk. Carothers was not holding anything and did not raise his hands towards Brown. Brown drew a firearm, began shooting Carothers, and continued discussing the fight. Carothers fell facedown. The van pulled away, and Brown paused before shooting Carothers several more times. Carothers last remembered asking if Brown would kill him, and Brown responding, "This, mother***, this is a hit. You know what it is." Carothers confirms that

the police officers had treated him well and his statement was not the result of threats, promises, or coercion, but his own free will.

¶ 13    Carothers further testified he had viewed a video of himself being shot but did not recall identifying himself on the video and testified the video was dark. He identified People's Exhibit No. 4 as the video he had viewed but was not sure if it showed him and the corner where he was shot. The video was admitted into evidence. Carothers did not recall lying on the ground after being shot in the area depicted in the video or speaking to the paramedics.

¶ 14    On cross-examination, Carothers denied seeing or being told of a fight at Whipple and Madison. He drank "a lot" of Hennessy at Pinckney's house but denied drinking before trial.

¶ 15    Following Carothers's testimony, the State advised the court that it withdrew a contempt petition it had filed against Carothers.

¶ 16    Pinckney testified that she had known defendant and Brown for a few years and identified both in court. On October 12, 2017, defendant and Brown were dating. Pinckney fought defendant around 7 p.m. that evening. Following the fight, Pinckney called the police and went home. She did not know where defendant went. Just after midnight on October 13, Pinckney called a detective and told him that she observed defendant drop off Brown in the area and then saw Brown shoot Carothers. However, at trial she testified that she did not actually see either event because she was in her house.

¶ 17    The detective drove Pinckney to the police station, where a different detective administered photograph arrays. Pinckney identified an advisory form and photograph array she signed and confirmed that a statement written on the advisory form indicated that she stated the person whose photograph was circled was the driver and that person's boyfriend was the passenger and shooter

but testified at trial that the statement was a lie. Pinckney then identified another advisory form and photograph array she signed. The advisory form indicated that Pinckney stated the person whose photograph she circled shot Carothers and that Pinckney had argued with the shooter's girlfriend. The exhibits are in the record on appeal, and the second photograph array contains the notation "he did it" near the circled photograph.

¶ 18    Pinckney had a videotaped conversation with Detective Drees, Detective Rebecca Weathers, and an ASA, but testified that she had not seen what she told them she saw. Pinckney confirmed that she had viewed the video, which accurately depicted the conversation. The video was admitted into evidence, published, and is in the record on appeal.

¶ 19    In the video, ASA Luis Muniz, Detective Drees, and Detective Weathers identify themselves, and ASA Muniz notes that it is 5:11 p.m. on October 13, 2017. Pinckney confirms that she spoke with ASA Muniz previously and detailed the events of the shooting. Pinckney states she knew Brown and defendant from around the neighborhood. Pinckney saw defendant about once a week for the three prior years and had seen Brown, who dated defendant, approximately 10 times before. She identifies and signs photographs of Brown, defendant, and Carothers, her boyfriend. She cries as she identifies Carothers's photograph. Pinckney states that she knows Brown to carry a firearm and had seen him with a firearm approximately three times before.

¶ 20    Pinckney confirms that, around 8 p.m. on October 12, 2017, defendant requested Pinckney to drive her to her vehicle, Pinckney dropped defendant off near the maroon Montana van which Pinckney knew defendant had recently obtained, and defendant confronted Pinckney over an old social media message. Pinckney then parked at Madison and Whipple, and defendant arrived in the maroon van. Defendant and Pinckney exited their vehicles and fought for about two minutes.

Pinckney called the police, who arrived quickly and told everyone to leave. Pinckney then parked her vehicle in an alley behind her home.

¶ 21    Pinckney sat in her vehicle for 15 to 20 minutes, then saw defendant and Brown enter the alley from Whipple in defendant's van. She saw Brown's face as he lay back in the passenger seat. The front windows of the van were not tinted, and Pinckney could see through them clearly.

¶ 22    Carothers exited Pinckney's home and had a short argument with Pinckney. He then walked down the alley towards Sacramento Boulevard. The van reversed and drove towards Whipple. Pinckney followed the van on foot, and from the mouth of the alley looked towards Madison and Whipple. Nothing blocked Pinckney's view, and although it was dark, there were streetlights and lights on Rothschild's storefront. She saw Brown and Carothers arguing right next to each other. She had not seen Brown exit the van. Defendant remained in the van's driver's seat.

¶ 23    Pinckney demonstrates how Brown drew a firearm from his waistband and pointed it at Carothers. Carothers raised his hands, which Pinckney demonstrates, and ducked. From four or five feet away, Brown fired two shots at Carothers. Pinckney ran through the alley towards her home, called the police, and told the dispatcher that a maroon Montana van was "shooting people." She heard the van drive away but did not hear more gunshots. An ambulance and police officers arrived quickly. Pinckney then walked back towards Whipple and Madison and saw Carothers lying on the ground shot.

¶ 24    Pinckney confirms that she viewed photographs at the police station around 2:20 a.m. on October 13, 2017, and identifies an advisory form and photograph array in which she identified defendant as the driver of the van by circling defendant's photograph and placing her name and birthday near the photograph. She then identifies an advisory form and photograph array in which

she identified Brown as the shooter by circling his picture, writing "he did it," and adding her name and birthday. Pinckney confirms that the advisory forms indicated she had not consented to being recorded while she viewed the arrays, but that she now consents to be videotaped. Pinckney confirms she is giving the statement freely and voluntarily, she had been treated well by the officers, her statement was not the result of threats or promises, and that she was not under the influence of drugs or alcohol during her videotaped statement or when she spoke with ASA Muniz previously.

¶ 25 Pinckney further testified that, the morning of trial, she met with prosecutors and stated that she did not remember what happened and had been drinking that morning. She identified the maroon vehicle in People's Exhibit No. 4 as defendant's.

¶ 26 On cross-examination, Pinckney testified that she was "high" and drank a "half pint" of liquor before trial and heard Carothers state that he also drank before trial. On October 12, 2017, she was drinking elsewhere while Carothers slept at her home.

¶ 27 The court asked Pinckney why she and defendant fought. Pinckney explained that defendant approached Pinckney while Pinckney was in her vehicle on Whipple and requested $20. Pinckney did not have the money but drove defendant to defendant's vehicle near Madison and Francisco Avenue. When defendant exited Pinckney's vehicle, she mentioned something said on social media "years ago." Pinckney and defendant "passed words," and Pinckney told defendant she would stay away from defendant and returned to Whipple. Defendant also returned to Whipple, and the two fought. Defense counsel asked what was said on social media, but Pinckney did not know what defendant was referencing.

¶ 28    Carothers was not present when Pinckney and defendant fought. Defendant fell, but Pinckney denied that someone said to "take something out of her pocket," and stated that defendant had no money. Defendant did not threaten Pinckney or tell Pinckney that she would return.

¶ 29    Detective Drees testified that he was assigned to the investigation around 8:30 p.m. on October 12, 2017, and proceeded to Whipple and Madison. On the east side of Whipple is Rothschild's and to the west of Whipple is a vacant lot. An alley runs east to west just south of Rothschild's.

¶ 30    Detective Drees observed blood, clothing, and what appeared to be four bullet fragments on the sidewalk. Detective Drees obtained footage from cameras affixed to Rothschild's, which captured a shooting. Detective Drees identified People's Exhibit Nos. 4 and 17 as the footage, which were admitted into evidence, published, and are included in the record on appeal. Neither video includes audio.[4]

¶ 31    The first video depicts an intersection. It is dark, but bright light emanates from the storefront and there is streetlighting. A person walks towards the intersection on the same side of the street as the camera and leaves the frame. A red or maroon van then arrives and parks near the intersection. A second person then walks towards the intersection from the same direction as the first. The two people then walk back the way they came, passing by the van. They are a few feet apart and appear to speak. They exit the frame. The second person then reappears, moving quickly, and gestures towards a point on the ground just offscreen. The person walks towards the passenger

---

[4] Both videos are contained on a CD, but the file names do not distinguish which is People's Exhibit No. 4 and which is People's Exhibit No. 17.

door of the van, but circles and gestures towards the ground in the same place. The van pulls forward and turns right, and the person jogs in the same direction.

¶ 32    The second video depicts the same events but is filmed from the side of the store. As the two people speak, the second person turns towards the first person and points something at that person. The first person raises his hands and falls to the ground. The second person approaches the other person, leans down, and gestures. A muzzle flash is visible. The shooter circles towards the van and then back towards the person on the ground and gestures downward again. The van drives away, and the shooter follows the van. The victim is lying on the ground.

¶ 33    Detective Drees learned that the victim was sedated and intubated at the hospital and returned to the police station. After midnight on October 13, 2017, Detective Drees took a phone call from Pinckney, who stated that she witnessed part of the shooting and that Brown shot Carothers, her boyfriend. Pinckney also provided defendant's name. Detective Drees asked if Pinckney would come to the police station and sent other officers to pick her up. Detective Drees then prepared photograph arrays for another detective to show Pinckney.

¶ 34    Pinckney arrived at the police station and viewed the arrays. Detective Drees identified the advisory forms and photograph arrays, in which Pinckney identified defendant and Brown and wrote "he did it" near Brown's photograph.

¶ 35    Detective Drees and another officer then spoke with Pinckney, and Pinckney related the events she later described in her videotaped statement. Pinckney told Detective Drees she could show him defendant's residence, where Brown often stayed, and they drove to the 2700 block of South Central Park Avenue, where Pinckney identified defendant's residence. As they drove away, Pinckney identified defendant's maroon Montana van, which resembled the van depicted in the

videos. The officers took Pinckney home, then returned to the residence, where they found defendant, whom Detective Drees identified in court. Detective Drees spoke with defendant and arrested her. Defendant gave Detective Drees a set of keys which Detective Drees used to open the Montana van. The address defendant gave while being processed matched the residence Pinckney had identified.

¶ 36     Pinckney returned to the police station and spoke with Detective Drees and ASA Muniz. Pinckney repeated what she had told Detective Drees. ASA Muniz then spoke with Pinckney privately, and Pinckney agreed to give the videotaped statement.

¶ 37     After defendant was arrested and taken to the police station, Detective Drees and Detective Weathers met with her at 5:23 a.m. on October 13, 2017. Detective Drees advised her of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and defendant agreed to speak. Defendant's interview was recorded, and a portion of the video, which is in the record on appeal, was admitted and published.

¶ 38     In the video, defendant denies being in a fight. Detective Weathers asks if Brown called defendant before the shooting, and defendant states they had been speaking that day, but she did not remember because she had been drinking. Defendant states that she was driving to Rothschild's, observed Brown come out of the alley, and parked on the opposite side of the street from Rothschild's. Brown and Carothers argued, and defendant exited her vehicle and called them "stupid." She reentered her vehicle, heard gunshots, and saw Brown standing over Carothers, shooting him. She states she was not involved with the shooting and did not take Brown there to "do anything" or know he had a firearm. Brown came from "somewhere else," and defendant and Brown had been arguing over the phone all day. She did not know how many shots he fired, and

she left the scene alone. Detective Drees asks if she stayed on Madison or turned onto another street, and defendant states that she does not remember because she is intoxicated. At some point after the shooting, defendant spoke to Brown, who apologized to her and said he did not know what happened. Defendant confirms that Brown "snapped" because Carothers took some things from her.

¶ 39 Detective Drees further testified that he and Detective Weathers then exited the room, and returned around 6:27 p.m. Detective Drees *Mirandized* defendant again, and defendant gave another videotaped statement. A portion of the interview, which is in the record on appeal, was admitted and published.

¶ 40 In the video, defendant denies knowing Brown would shoot Carothers until it happened and states she did not know what he "had on him." Defendant states that she picked Brown up, told him she had been "jump[ed]" and some men attempted or suggested going through her pockets while she was down, and the men, including Carothers, were on Whipple. Detective Weathers asks if she knew Brown sought Carothers and would shoot him but did not know it would be so "bad," and defendant responds, "Yeah." Defendant states she knew something would happen but did not know exactly what Brown would do and maintains that she did not know Brown had a firearm until he drew it and fired.

¶ 41 Defendant nods and responds affirmatively while Detective Weathers asks if she picked up Brown and drove to Whipple, where Carothers was, because they were angry about the fight, and that Brown would "take care of the situation." Defendant agrees that she thought Brown and Carothers might fistfight. She denies that Brown indicated he had a firearm or would shoot Carothers and repeats she did not know he was armed. She nods and responds affirmatively as

Detective Weathers asks if she knew things would be "bad," but did not think Carothers would be so injured, believing he would perhaps be shot in the arm or leg, and Brown went "overboard." Detective Weathers asks if that was their intention and defendant responds that it was. Defendant confirms that she knew it was possible Brown would shoot Carothers. Detective Weathers asks if Brown said anything when he entered her vehicle on Sacramento, and defendant says no.

¶ 42    On October 19, 2017, Detective Drees spoke with Carothers, who was hospitalized in intensive care. Carothers told Detective Drees that Brown shot him and defendant was present. Detective Drees then showed Carothers photographs of Brown and defendant, but Carothers was too weak to sign them.

¶ 43    Carothers came to the police station on November 5, 2017, and gave a more detailed statement. ASA Fisher arrived and met with Detective Drees and Carothers, and then Carothers alone, and Carothers agreed to give the videotaped statement.

¶ 44    The State entered a stipulation that a Chicago police detective would testify that he administered to Pinckney two photograph array packets prepared by Detective Drees and did not speak with Detective Drees about the investigation and would identify the advisory forms and photograph arrays.

¶ 45    Officer Balcarzak testified that he was an evidence technician with the Chicago Police Department.[5] Officer Balcarzak processed the scene at Whipple and Madison, and observed bloody, discarded clothes, a blood stain, and firearm evidence on the sidewalk. Officer Balcarzak recovered the evidence and took photographs which were admitted into evidence and published.

_____

[5] Officer Balcarzak's first name is not in the report of proceedings.

¶ 46    Dr. Harvey Louzan testified that he worked in the emergency room the night of October 12, 2017. Carothers arrived by ambulance around 9:30 p.m. in critical condition. Carothers had been shot five times, in his right hand, left arm, right chest, left chest, and the back of his head. He stabilized in a medically-induced coma. Scans revealed a large bullet fragment in his skull and a small blood clot or small amount of bleeding surrounding his brain, air in his plural cavity, a contusion and laceration of his lung, and two fractured vertebrae.

¶ 47    ASA Muniz testified that he spoke with Pinckney at the police station around 5 p.m. on October 13, 2017. Pinckney spoke clearly and concisely but was "visibly distraught" and occasionally cried. Pinckney agreed to give a videotaped statement and told ASA Muniz privately she had not been forced or threatened to speak with him, gave her statement freely and voluntarily, and that her statement described what she had witnessed.

¶ 48    ASA Fisher testified that he met with Carothers at the police station on November 5, 2017. Carothers agreed to give a videotaped statement and never told ASA Fisher that the police suggested to him who had shot him.

¶ 49    ASA Christopher Thor Martin testified that he met with Pinckney and Carothers the morning of trial. Pinckney told ASA Martin that she could not remember anything from the shooting. Carothers had been subpoenaed for a previous court date and did not appear, so ASA Martin's office filed a petition for contempt against him and the court issued a warrant for his arrest. On cross-examination, ASA Martin testified Carothers told him he had one drink before trial.

¶ 50    Brown's counsel called several witnesses, whose testimony defendant's counsel adopted.

¶ 51    Jose Val Limbo, a paramedic who testified that he treated Carothers on October 12, 2017, refreshed his memory with his run sheet from that date. Carothers had been shot but was alert and oriented. Limbo asked Carothers if he knew who shot him, and according to the run sheet, Carothers stated an "unknown person" shot him. Had Carothers named the shooter, Limbo would have written it down and told the police.

¶ 52    On cross-examination, Limbo agreed that, apart from the run sheet, he did not recall what happened on October 12, 2017, including Carothers's appearance or where he was shot. When a patient responds that he does not know who shot him or gives no answer, Limbo writes that the shooter is unknown. On redirect examination, Limbo testified that if the run sheet indicated the patient stated the shooter was unknown, that is what happened.

¶ 53    Erin Hansen, a supervisor for the City of Chicago's Offices of Emergency Management Communication (OEMC), testified that OEMC keeps records of 911 calls that show the phone number placing the call. No calls regarding a fight near Sacramento and Madison were made between 7 and 8 p.m. on October 12, 2017. Hansen identified a report for a phone number which indicated that a 911 call came from that number at 8:35 p.m. on October 12, 2017. On cross-examination, Hansen stated that she did not have an audio recording of that call.

¶ 54    Carol Knudsen testified that she took 911 calls for OEMC. When a 911 call comes in, the employee taking the call puts the information into a ticket. Knudsen identified a ticket she created for a 911 call at "8:35" on October 12, 2017. The ticket noted the phone number from which the call came but did not indicate that the caller gave a name.

¶ 55    On cross-examination, Knudsen agreed that all she wrote on the ticket was "Red Montana van, female black, dark skinned driving, male passenger shooting, they live at 27 South Harding."

Knudsen did not remember taking the call, but, based on the ticket, stated that the caller was frantic as she relayed what she saw.

¶ 56 In closing argument, defense counsel posited that defendant did not know Brown possessed a firearm and would shoot Carothers, and therefore could not be responsible for the shooting. Accordingly, defense counsel asserted:

> "I argue that she hasn't been proven guilty beyond a reasonable doubt of attempt first degree murder. She hasn't been proven guilty beyond a reasonable doubt of aggravated battery, firearm. At most, she has been found guilty of aggravated discharge by accountability for what Eugene Brown did but nothing else."

¶ 57 Following arguments, the court acquitted defendant of the attempt murder counts but found her guilty, under a theory of accountability, of aggravated battery and aggravated discharge of a firearm.

¶ 58 The court denied defendant's posttrial motion but stated that it intended to merge the counts "into the aggravated battery with a firearm which is the more serious offense."

¶ 59 The court then asked defendant if she wished to apply her bond to defense counsel's fees. Defendant responded "No," and stated she wished to "relieve him of his duty" and had a *pro se* motion alleging ineffective assistance of counsel. The court inquired into her complaints, and she stated that counsel did not comply with her requests regarding witnesses or act when she told him she was threatened not to testify against Brown. Defense counsel responded that he told the State that defendant was being threatened and noted that defendant declined the State's plea offer because of the threats. The court stated that it would hold a *Krankel* hearing on the next court date.

¶ 60    Defendant's *pro se* motion, which is included in the record, alleged that defense counsel failed to file motions, call witnesses defendant identified, investigate the case, show defendant evidence, ask the cross-examination questions she requested, respond to her requests to discuss the case or return her calls, protect her when she was threatened, be punctual and prepared, or argue in her defense. Defendant's motion named witnesses to counsel's inadequate performance, including one who drove defendant to an appointment with counsel, who did not appear. Defendant also filed a letter from the Attorney Registration and Disciplinary Commission (ARDC) indicating that she had complained to the ARDC regarding counsel's performance.

¶ 61    At the *Krankel* hearing, the court noted that it had read defendant's motion and queried defendant about her claims. Defendant alleged that counsel was deficient for (1) not obtaining video of Brown and Carothers arguing in Rothschild's over "street stuff" on the day of the shooting, which defendant contended showed she was not involved in the shooting; (2) not moving to suppress her statement because she was intoxicated and coerced by Detective Weathers, who told her what to say and stated defendant could not go home to her children unless she confessed; (3) not obtaining further video of the interrogation, where she stated she did not know Brown would shoot Carothers; (4) not calling Antwion Smith to testify that defendant was not the reason Brown shot Carothers; (5) acting as if she were guilty, speaking over her, and not listening to her; and (6) not showing her the video of the shooting prior to trial.

¶ 62    The court also queried counsel, who stated that defendant did not inform him of Smith or of any independent animosity between Brown and Carothers, while Carothers stated in his videotaped interview that he and Brown were friends. Counsel also questioned defendant's

truthfulness because her statement to the officers that she exited the vehicle and spoke to Carothers and Brown as they argued was not supported by video of the shooting.

¶ 63    The court asked counsel what evidence concerned him as he prepared for the case and whether he considered filing a motion to suppress. Counsel cited defendant's statement that she had fought Pinckney and drove Brown to the shooting. Counsel explained to defendant "from the beginning" that the State must prove her intent to commit or aid the crime and, because she told the officers she did not know Brown had a firearm, her defense would be that she lacked intent and knowledge. Counsel decided not to move to suppress defendant's statements because she appeared responsive, lucid, and uncoerced, she spontaneously offered information and stated facts corroborated by other evidence, and never admitted that she knew Brown was armed. Counsel added that he lacked the equipment to play the video of the shooting, but met with the State to view it, and communicated its content to defendant in an "extensive" text message.

¶ 64    The court noted that counsel succeeded in acquitting defendant of attempt murder, made strategic decisions, and indicated that he had not heard of other motivations for Brown to shoot Carothers. The court denied defendant relief because it found that the guilty verdict was not counsel's "fault," and stated it would not grant a new trial based on ineffective assistance of counsel. The court offered to appoint defendant a public defender or allow her to hire new counsel, but counsel continued to represent her through the remainder of the proceedings without her objection.

¶ 65    Following a hearing, the court sentenced defendant to 90 months' concurrent imprisonment on both counts, which is reflected on the mittimus. Defendant did not file a postsentencing motion.

¶ 66     On appeal, defendant first argues that the State failed to prove her guilt beyond a reasonable doubt where no evidence established that she ordered Brown to shoot Carothers or gave Brown a firearm, her confrontation with Pinckney was minor, the video of the shooting shows her driving away without Brown, and defendant's only admissions that she knew Brown might shoot Carothers came when Detective Weathers asked her leading questions.

¶ 67     When a defendant challenges the sufficiency of the evidence, the reviewing court views the evidence in the light most favorable to the State to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts. *Id.* Therefore, the reviewing court will not retry the defendant or substitute its judgment for the trier of fact's on issues involving the weight of the evidence or the witnesses' credibility. *Id.* We will not overturn a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *Id.*

¶ 68     Defendant was convicted under a theory of accountability of aggravated battery with a firearm and aggravated discharge of a firearm. As charged here, a person commits aggravated battery with a firearm when she knowingly discharges a firearm and causes injury to another. 720 ILCS 5/12-3.05(e)(1) (West 2016). A person commits aggravated discharge of a firearm, in relevant part, when she knowingly or intentionally discharges a firearm in the direction of another person. 720 ILCS 5/24-1.2(a)(2) (West 2016).

¶ 69     A person is legally accountable for the conduct of another when she, before or during the commission of an offense and with the intent to promote or facilitate that commission, solicits,

aids, abets, agrees, or attempts to aid the other person in planning or committing the offense. 720 ILCS 5/5-2(c) (West 2016). To prove that a defendant intended to promote or facilitate a crime, the State may present evidence that either (1) she shared the principal's criminal intent, or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. Under the common-design rule, all parties to a common criminal design or agreement are responsible for the consequences of any act committed in furtherance of the design or agreement. *Id.* In other words, "where one aids another in the planning or commission of an offense, that person is legally accountable for the conduct of the person he aids," including "any criminal act done in furtherance of the planned and intended act." *Id.* ¶ 18.

¶ 70 A defendant's "mere presence" at the scene of a crime, even coupled with flight from the scene or knowledge that a crime was committed, is insufficient to prove accountability. *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 132. However, "[a]ccountability may be established by presence at the scene of the crime, a finding that defendant had knowledge of criminal intent, flight, association with coconspirators after the incident, and a failure to report the incident." (Internal quotation marks omitted.) *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 119.

¶ 71 Here, the evidence at trial established that, shortly before the shooting, defendant fought Pinckney, Carothers's girlfriend or ex-girlfriend. During that incident, someone attempted to go through defendant's pockets or suggested someone else do so. Defendant told Brown what happened, drove Brown to the area, and knew Brown would do something "bad" to "take care of the situation," including possibly shooting Carothers. Pinckney and Carothers saw defendant and Brown enter the alley behind Pinckney's home from Whipple in defendant's van. When Carothers exited the alley and walked to Whipple and Madison, the van parked on the street. Brown then

approached Carothers from Whipple, confronted him about the fight, shot Carothers, and stated the shooting was "a hit." The video shows that the van then turned right and drove away, and Brown jogged in the same direction. Defendant picked him up on Sacramento.

¶ 72    Viewing the evidence in the light most favorable to the State, including Carothers's and Pinckney's videotaped statements identifying Brown as Carothers's shooter, a rational trier of fact could find that Brown committed aggravated battery with a firearm and aggravated discharge of a firearm when he shot at Carothers and injured him. Moreover, a rational trier of fact could conclude that defendant was guilty under a theory of accountability for Brown's shooting of Carothers where she told Brown about the fight, drove Brown to the shooting, knew he would do something "bad" and might shoot Carothers, was present during the shooting, picked up Brown after the shooting, and did not report the incident.

¶ 73    Defendant maintains that she did not know Brown would shoot Carothers, comparing her case to *People v. Taylor*, 186 Ill. 2d 439, 446-48 (1999) (mere presence at crime scene insufficient for aggravated discharge conviction where defendant knew passenger in defendant's vehicle possessed firearm, and shooter exited vehicle, shot at someone, reentered vehicle, and defendant drove away) and *People v. Estrada*, 243 Ill. App. 3d 177, 180, 185 (1993) (insufficient evidence defendant knew driver of vehicle intended to shoot victim where defendant knew there was a firearm in the vehicle, but defendant exited vehicle to intimidate victim with tire iron and driver shot victim from inside vehicle).

¶ 74    However, *Fernandez* distinguished *Taylor* where, in *Taylor*, the defendant did not know that a passenger in his vehicle intended to commit any crime, let alone the crime ultimately committed. *Fernandez*, 2014 IL 115527, ¶¶ 20-21. *Taylor*, therefore, was a specific intent case,

not a common-design rule case where the defendant "intentionally sets out to promote or facilitate the commission of a crime." *Id.* ¶ 21.

¶ 75    While defendant notes that the State theorized at trial that defendant "ordered" Brown to shoot Carothers and argues that we may not affirm without sufficient evidence of that theory, the State could establish accountability by evidence that she shared Brown's criminal intent or a common criminal design (*id.* ¶ 13), and, on appeal, we are tasked with examining all of the evidence and determining whether it reasonably supports the defendant's guilt beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 117-18 (2007). Here, the evidence supports defendant's accountability under the common-design rule, where defendant agreed in her statement that she knew Brown might shoot Carothers and admitted that she knew Brown would do something "bad."

¶ 76    Additionally, our supreme court in *Fernandez* overruled *People v. Phillips*, 2012 IL App (1st) 101923, which relied on a "misunderstanding" of *Taylor* to hold that a defendant was not culpable for a shooting where he intended to help someone commit a crime against the victim but did not know the person possessed a firearm. *Fernandez*, 2014 IL 115527, ¶¶ 19-20. For similar reasons, we find defendant's reliance on *Estrada* unavailing where the defendant's conviction in *Estrada* was reversed because there was "no direct evidence" that he participated in a common plan or design to shoot the victim. *Estrada*, 243 Ill. App. 3d at 185. *Estrada* is therefore factually distinguishable, and, as *Fernandez* instructs, defendant may be culpable for the shooting where she intended to help Brown commit a crime against Carothers.

¶ 77    Lastly, defendant argues that her admissions resulted from leading questions by the police officers, the fact that she drove away without Brown shows that she was unaware he would shoot

Carothers, and the shooting may have been connected to Carothers's criminal history.[6] However, we will not substitute our judgment for the trier of fact's on questions involving the weight of the evidence (*Gray*, 2017 IL 120958, ¶ 35), and the trier of fact need not raise all possible explanations consistent with innocence to the level of reasonable doubt (*People v. Newton*, 2018 IL 122958, ¶ 24). Thus, we conclude there was sufficient evidence to sustain defendant's convictions.

¶ 78    Defendant next argues that we should remand for further proceedings on her *pro se* claim of ineffective assistance of counsel where the record supports her claims that counsel potentially neglected her case.

¶ 79    Pursuant to *Krankel*, a common-law procedure has developed to allow the trial court "to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." (Internal quotation marks omitted.) *People v. Jackson*, 2020 IL 124112, ¶ 95. The trial court must first examine the claim's factual basis. *Id.* ¶ 97. If the defendant's allegations show "possible neglect" by counsel, the court should appoint new counsel to represent the defendant at a hearing. *Id.* If, however, the trial court determines that the claim lacks merit or pertains only to trial strategy, it may deny the motion without appointing independent counsel. *Id.* The preliminary inquiry creates a necessary record for any claims subsequently raised on appeal. *People v. Ayres*, 2017 IL 120071, ¶ 13. In conducting the preliminary inquiry, the court may (1) inquire of trial counsel about the defendant's allegations,

_____

[6] In support of this theory, defendant argues that Carothers sold narcotics on the corner where he was shot. This information, however, was adduced during Carothers's cross-examination by Brown's counsel, which was not adopted by defendant. Consequently, we will not consider that evidence where it was not introduced in defendant's trial. See *People v. Steidl*, 142 Ill. 2d 204, 226 (1991) ("It is axiomatic that the evidence to be reviewed on appeal must be the evidence presented to the fact finder at trial.").

(2) discuss the allegations with the defendant, or (3) make a determination based on its own knowledge of counsel's performance at trial and the allegations' insufficiency. *Id.* ¶ 12.

¶ 80    Initially, the State argues that defendant was not entitled to a *Krankel* hearing because she had private counsel. See *People v. Pecoraro*, 144 Ill. 2d 1, 15 (1991) (*Krankel* inapplicable "where defendant retained his own private counsel and did not request that he be represented by other counsel"). The appellate districts are split as to whether *Krankel* inquiries are required where the defendant is represented by private counsel. Compare *People v. Shaw*, 351 Ill. App. 3d 1087, 1092 (2004) (no inquiry required where defendant represented by private counsel, did not request new counsel or continuance to obtain new counsel, and parties did not agree defendant should have different counsel for postplea motion) with *People v. Johnson*, 227 Ill. App. 3d 800, 810 (1992) (declining to read *Pecoraro* for the proposition that trial court may automatically deny request for new counsel because counsel was privately retained). More recently, Justice Anne Burke of our supreme court stated that "[t]o read *Pecoraro* as prohibiting a *Krankel* inquiry simply because counsel was retained would conflict with Supreme Court authority and would be a violation of the sixth amendment right to effective assistance of counsel." *People v. Taylor*, 237 Ill. 2d 68, 81 (2010) (Burke, J., specially concurring). Here, we need not resolve this conflict because, even accepting that defendant was entitled to *Krankel* proceedings, the trial court's decision not to appoint independent counsel would not warrant remand.

¶ 81    The parties further dispute the appropriate standard of review. The State argues that, because defendant challenges the trial court's decision to deny her relief following the inquiry, we should review for manifest error. See *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008) (trial court's decision not to appoint new counsel only reversed if manifestly erroneous). Defendant

responds that the proper standard is *de novo*, arguing that the trial court applied the wrong standard at the hearing when it stated that the guilty verdict was not counsel's "fault." See *id.* (the standard for reviewing whether a trial court conducted a proper *Krankel* inquiry is *de novo*) (citing *People v. Moore*, 207 Ill. 2d 68, 79 (2003)).

¶ 82    At a preliminary *Krankel* hearing, the trial court is charged with determining whether the defendant's allegations show that defense counsel possibly neglected the case. *Moore*, 207 Ill. 2d at 77-78. We disagree that the court applied a higher standard here. The record reflects that the trial court conducted a preliminary inquiry to determine whether new counsel should be appointed and questioned defendant and counsel, including inquiring into the formation of counsel's trial strategy. See *In re N.B.*, 191 Ill. 2d 338, 345 (2000) ("The circuit court is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record."); see also *Jackson*, 2020 IL 124112, ¶ 105 (trial court may consider merits of defendant's claims in their entirety to determine whether to appoint new counsel). That inquiry distinguishes *Moore*, where the trial court performed no inquiry whatsoever. *Moore*, 207 Ill. 2d at 79; see also *McCarter*, 385 Ill. App. 3d at 941 (distinguishing *Moore* because "whether defendant's ineffective assistance claims are meritorious is necessarily grounded in the specific facts of the case, so it is appropriate for us to give deference to the finding of the trial court").

¶ 83    Accordingly, we will review the trial court's decision not to appoint independent counsel for manifest error. See *People v. Robinson*, 2017 IL App (1st) 161595, ¶ 90 (where trial court conducted proper inquiry and reached determination on the merits, we will reverse only if manifestly erroneous). "Manifest error is error that is plain, evident, and indisputable." (Internal

quotation marks omitted.) *People v. Cook*, 2018 IL App (1st) 142134, ¶ 106. Moreover, even if we find error, we will not overturn the trial court's ruling if the error was harmless. *Id.*

¶ 84    First, defendant claims that counsel failed to adequately communicate. Defendant stated in her written motion that counsel did not return her calls, and once, she was driven to an appointment with counsel, but counsel did not appear. However, defendant's motion references cross-examination questions that she told counsel to ask, and at the hearing, defendant stated whenever she and counsel spoke, counsel talked over her and did not listen, and that she told counsel "several times" that she was not guilty. Those facts indicate that she and counsel were communicating in some capacity. Further, counsel explained at the hearing that he discussed the defense with her, communicated through text message regarding the surveillance video, and discussed a plea offer by the State. Before trial, counsel advised the court that he and defendant had discussed filing a motion to suppress her statement.

¶ 85    Relatedly, defendant argues that, if she and counsel had communicated adequately, he would have known to investigate Smith and other motivations Brown may have had in shooting Carothers. Defendant also notes that Brown, in addition to Carothers, has a lengthy criminal history which counsel was alerted to at a pretrial bond hearing. Counsel explained, however, that he did not think there was reason to investigate independent animosity between Brown and Carothers because Carothers and Brown were old friends, and the hearing was the first time defendant mentioned Smith or other potential explanations for animosity between Brown and Carothers.

¶ 86    After hearing the foregoing, the trial court ruled that defendant did not make a showing of possible neglect. We do not find manifest error in the trial court's decision. Moreover, there was overwhelming evidence that defendant participated in a criminal design with Brown where she

stated that she drove Brown to Whipple in search of Carothers so he could "take care of the situation" regarding the earlier fight. See *People v. Tolefree*, 2011 IL App (1st) 100689, ¶¶ 23-24 (if record is adequate, appellate court may evaluate decision not to appoint new counsel for harmless error); see also *Cook*, 2018 IL App (1st) 142134, ¶ 110 ("Moreover, defendant failed to show that additional communications would have altered the outcome of his case.").

¶ 87    Third, defendant argues that she raised a claim of possible neglect where counsel did not show her the surveillance footage of the shooting before trial. Defendant notes the case pended for over a year, the video was of high evidentiary value and "very moving," and defendant therefore could not make an informed decision of whether to proceed to trial without having seen it. The court inquired of defense counsel as to this claim, and counsel stated that he lacked equipment to view the video, arranged to view it with the State, and communicated the video's content to defendant in an "extensive" text message. Specifically, counsel advised defendant that the video depicted the vehicle at the corner and Brown shooting Carothers and fleeing but did not depict her or Brown entering or exiting the vehicle. Additionally, counsel stated that defendant declined the State's plea offer because she felt threatened, not because she was uninformed. Where the trial court inquired into counsel's explanation, we will not say the court committed "plain, evident, and indisputable" error in concluding that defense counsel was not possibly neglectful because he was unable to play it himself but communicated its content to defendant. *Cook*, 2018 IL App (1st) 142134, ¶ 106.

¶ 88    Fourth, defendant contends that she showed possible neglect where counsel failed to move to suppress her statement where she was intoxicated and coerced. However, counsel explained before trial that he did not believe there was ground to suppress the statement, and so would argue

its weight. Then, during the preliminary *Krankel* inquiry, the trial court asked counsel whether he considered filing such a motion, and counsel explained that he did, but decided against it because, in the video, defendant was responsive, apparently lucid, and offered spontaneous information. And, while counsel did not ultimately argue at trial that the statement should be given little weight, counsel also noted at the *Krankel* hearing that defendant's theory of the case was that she did not know Brown possessed a firearm until he drew it and shot Carothers, evidence which was adduced through the videotaped statement. We cannot say that the trial court manifestly erred in not appointing independent counsel where it queried defense counsel and defense counsel offered strategic reasons regarding his decision. See *id.* ¶ 104 ("If the trial court determines the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion.").

¶ 89    Last, defendant argues that counsel conceded her guilt in closing argument, but we do not find manifest error regarding this argument. During closing argument, counsel argued that defendant did not know Brown possessed a firearm and would shoot Carothers, was not guilty of attempt first degree murder or aggravated battery, and "[a]t most," was guilty of aggravated discharge. Counsel's statement that defendant, if guilty, was only guilty of aggravated discharge, was not a concession of guilt. Further, given that defendant agreed in her statement that she knew it was possible Brown would shoot Carothers, counsel's attempt to minimize her culpability instead of arguing she was innocent was a valid strategic one. *People v. Shatner*, 174 Ill. 2d 133, 147-48 (counsel not ineffective for arguing that defendant was not guilty of murder and arson and, if guilty of anything, was only guilty of robbery, where defendant's own statements undermined

claim of innocence). Accordingly, we decline to remand for the appointment of independent counsel and further *Krankel* proceedings.

¶ 90    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 91    Affirmed.